*Decision will be entered under Rule 50.*

Mozelle C. Kluss, Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket No. 2210–65. Filed August 9, 1966.

Leon O. Lewis, Jr., for the petitioner.
Ralph V. Bradbury, Jr., for the respondent.

Dawson, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year 1962 in the amount of $3,005.06.

In his notice of deficiency the respondent disallowed a $25 deduction claimed by petitioner as a contribution to the Scholarship Educational Record and $9.60 claimed for excise taxes paid on her telephone service. The petition does not allege error as to these items and no evidence was presented at the trial, so we consider them as abandoned.

The only issue for decision is whether the petitioner can deduct as a charitable contribution under section 170, I.R.C. 1954, the amount of $5,000 given in 1962 to the International Services of Information Foundation, Inc., a nonexempt organization, and used by the foundation to send copies of its publication to certain charitable organizations.

## FINDINGS OF FACT

Most of the facts have been stipulated by the parties and are hereby found accordingly.

Mozelle C. Kluss (hereafter called petitioner) resides at 551 Country Lane in San Antonio, Tex. She filed her Federal income tax return for the taxable year 1962 with the district director of internal revenue at Austin, Tex.

On February 12, 1962, International Services of Information Foundation, Inc. (hereafter called Foundation), was located in Baltimore, Md. It had previously applied for and had been denied exemption by the Internal Revenue Service as an exempt organization under section 501(c) (3), I.R.C. 1954. Contributions to it are not deductible for Federal income tax purposes.

The principal means by which Foundation accomplished its objectives at that time were the printing and dissemination of a publication called "*In*form" which advocated the principles Foundation supported.[1] "*In*form" was printed and distributed approximately twice monthly. The annual subscription rate in 1962 was $25. Foundation received payments with the understanding that the payor could, if desired, designate a specific individual, organization, or group to which subscriptions to "*In*form" would be sent.

On February 12, 1962, petitioner made a cash payment by check in the amount of $5,000 to Foundation. Receipt of the $5,000 was acknowledged by Foundation in a letter to petitioner dated February 12, 1962. Petitioner claimed the $5,000 as a charitable contribution to Foundation in her 1962 Federal income tax return.

Petitioner had subscribed to "*In*form" for about a year prior to February 1962. She was in sympathy with its purposes and wanted the views of Foundation disseminated to others.

When she made the payment to Foundation, the petitioner had an understanding that 200 subscriptions of "*In*form" would be sent to members of the Texas State Legislature. In a letter of acknowledgment from Foundation dated February 19, 1962, its president said:

My fellow-Trustees and I have always felt that *In*form should go to the

---

[1] Each issue of "*In*form" is eight pages long. The publication contains facts and figures on life in and policies of Communist countries. Several issues contain cartoons from Krokodil. One objective of "*In*form" is "that citizens of the West see through the superficial welter of confusion and contradictions shrouding this Red push" (from issue No. 6207 dated June 14, 1962, referring specifically to the Communist thrust at the Iberian Peninsula).

legislators of all the States, but the burden would be too great for us to do it on a complimentary basis. Consequently, we are most grateful to you for making it available to those of Texas.

At that time the petitioner believed that giving subscriptions to individual members of the Texas State Legislature would result in a deductible charitable contribution for Federal income tax purposes. From February 19, 1962, until after her attorney received a letter from "*In*form National Reports" dated January 10, 1964 (Foundation having ceased to exist in the interim), the petitioner assumed that the $5,000 she gave to Foundation had resulted in the sending of subscriptions of "*In*form" to members of the Texas State Legislature. This letter advised that "In May, 1962, the Clerk of the House of Representatives refused to cooperate in the program, and on May 23rd, 1962 we pulled the plates from our mailing."

The 200 subscriptions were then sent by Foundation to American Legion posts, Catholic colleges and schools, and San Antonio public schools. A list of these organizations was sent to petitioner's counsel on January 16, 1964, by "*In*form National Reports."

All issues of "*In*form" were mailed to such organizations by first class mail and none were returned to Foundation. Several letters of thanks were received by Foundation from San Antonio public schools stating that the publication was an instructional aid.

Foundation did not in any way advise these organizations that petitioner was responsible for the subscriptions.

All of the organizations to whom the 200 subscriptions of "*In*form" were mailed were charitable organizations qualifying under section 170(c), I.R.C. 1954.

There was no written agreement between petitioner and Foundation requiring "*In*form" to be sent to members of the Texas State Legislature, nor was there any written agreement restricting the sending of subscriptions to organizations qualifying under section 170(c).

#### ULTIMATE FINDINGS

Petitioner made her $5,000 contribution "to or for the use of" Foundation, her intended beneficiary. Foundation was not an agent or trustee for others.

#### OPINION

The threshold question is whether, under section 170(c),[2] the petitioner's contribution was "to or for the use of" the nonexempt Foun-

---

[2] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a Territory, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

(2) A corporation, trust, or community chest, fund, or foundation—

dation or the charitable organizations which received the subscriptions to Foundation's publication, "*Inform*." The answer seems to turn principally on one critical factor, i.e., the donor's intent, although other factors may be relevant under different circumstances. Cf. *George E. Peace*, 43 T.C. 1 (1964) ; *Estate of Margaret E. Callaghan*, 33 T.C. 870 (1960) ; *Archibald W. McMillan*, 31 T.C. 1143 (1959) ; and *Fred Dohrmann, Jr.*, 18 B.T.A. 66 (1929). In other words, who did the petitioner actually intend to benefit when she made her contribution? This is the ready touchstone. Cf. *Commissioner* v. *Duberstein*, 363 U.S. 278, 285–286 (1960) ; and *DeJong* v. *Commissioner*, 302 F. 2d 373 (C.A. 9, 1962), affirming 36 T.C. 896 (1961).

Petitioner contends that the intended beneficiaries of her donation were the charitable organizations which received subscriptions to "*Inform*"; that Foundation acted only as an agent or trustee for such organizations; and that since the annual subscription rate to "*Inform*" in 1962 was $25, the fair market value of the 200 subscriptions sent to the charitable organizations was exactly $5,000. Respondent, on the other hand, maintains, first, that the intended beneficiary was Foundation, a nonqualifying organization under section 170(c)(2) ; and, secondly, that the amount given to Foundation was not deductible because it was originally designated or earmarked by petitioner to provide subscriptions to "*Inform*" to members of the Texas State Legislature, who are individuals not falling within the required class of donees under section 170(c)(2).

The circumstances surrounding petitioner's contribution to Foundation and the subsequent pass through to the charitable organizations in the form of subscriptions to "*Inform*" clearly show to our satisfaction that her intent was to benefit Foundation. She had subscribed to "*Inform*" for about 1 year. She liked it and agreed with the message it conveyed. Her primary purpose in making the contribution was to aid in the dissemination of Foundation's philosophy and information. She claimed on her 1962 income tax return a charitable contribution to "International Services of Information Foundation, Inc." While such characterization on her return, standing alone, does not conclusively establish her purpose, petitioner testified on cross-examination that she was "in sympathy with the purposes of the Foundation" and that it was her desire that her contribution would "help speed or spread" its purposes.

(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States ;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals ;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual ; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.

There is nothing in this record indicating an agency or trust relationship. Petitioner had no control over her contribution once payment was made to Foundation. Her obvious intent was to let Foundation have sole discretion and unfettered control in the use of the money. This is borne out by what happened. In May 1962 when the Clerk of the Texas House of Representatives notified Foundation that he would not "cooperate" in receiving the subscriptions, Foundation then immediately, without petitioner's knowledge, sent them to American Legion posts and various private and public educational institutions. It was not until January 10, 1964, that she knew about this change in recipients and her attorney was not provided with a list of the organizations until January 16, 1964, long after the subscriptions had expired. It is significant, too, that Foundation did not inform the charitable organizations that petitioner was responsible for making the subscriptions available and all letters of gratitude were received by Foundation.

We think the petitioner's reliance on *Denver & Rio Grande Western Railroad Co.*, 38 T.C. 557, 583–584 (1962), and *John Danz*, 18 T.C. 454 (1952), affd. 231 F. 2d 673 (C.A. 9, 1955), certiorari denied 352 U.S. 828, is misplaced because in both cases the Court found, on the basis of the facts and evidence there presented, that properties were given "in trust for the use of the City of Gunnison for exclusively public purposes" and to a "valid irrevocable trust for the use of charities of the kind described in section 23 (o). As our findings indicate, the facts of this case are so far different that they compel a contrary conclusion.

Where, as here, a gift of money is intended by the donor to be used, and in fact is used, as an indirect means of subsidizing the dissemination of information and views of a nonqualifying organization under section 170 (c) or to support the purposes of such organization, the contribution will be treated by this Court as having been made "to or for the use of" such organization rather than a contribution to the recipients of the literature. Therefore, we conclude that the amount given to Foundation by petitioner is not deductible as a charitable contribution under the provisions of section 170.

In view of this conclusion, we find it unnecessary to consider respondent's alternative argument that the contribution was intended for the use of members of the Texas Legislature or petitioner's counter argument that it was given for the use of the State of Texas so as to be deductible under section 170 (c) (1). Nor do we need to determine the fair market value of the subscriptions.

*Decision will be entered for the respondent.*