GREY B. (MILLER) TATE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7043–70.    Filed January 11, 1973.

*Samuel G. Brundage,* for the petitioner.
*John E. White,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for 1967 in the amount of $216.99. The only issue presented for decision is whether petitioner may deduct as a charitable contribution under section 170 [1] certain expenses incurred in connection with her minor son's visit to Europe.

[1] All section references are to the Internal Revene Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

FINDINGS OF FACT

Grey B. (Miller) Tate (hereinafter referred to as petitioner) filed her Federal income tax return for 1967 with the district director of internal revenue, Buffalo, N.Y. Between the time of filing her 1967 return and the filing of the petition in this case, she married Charles Draper Tate. She was a legal resident of Rochester, N.Y., when the petition was filed.

Petitioner and her son, Benson, have lived in Rochester since December of 1953. During the early part of 1954, they became members of the Third Presbyterian Church (hereinafter referred to as Third Church) in that city.

Third Church has about 2,300 members. It is a religious organization, contributions to which are deductible under section 170. On an unspecified date in 1966, the governing body of the church requested Stewart D. Moot to form a committee to prepare a work project for the teenage members of Third Church. The choice of the project and its execution were left to the committee. The committee initially tried to find a project in this country. However, their efforts failed because they could not find a site with sufficient accommodations to care for all the teenagers the committee anticipated would be involved.

The committee next contacted Rabbi Phillip Burnstein in the hope that with his many connections in Israel he could arrange for the teenagers to work on a kibbutz. They also contacted James Sanders, a professor at the Rochester Divinity School, in the hope that he could arrange for the teenagers to take part in an archaeological dig in the Holy Lands. For a period, these individuals thought arrangements for work projects of this kind could be developed and, during the spring of 1966, the trip was announced from the pulpit of Third Church and through the Messenger, the church's weekly newsletter.

In March 1966, material regarding the trip was sent to the teenage members of Third Church who were in their freshman and sophomore years of high school. The material included a two-page information sheet entitled "Third Church Young People, Trip to the Holy Lands, Summer of 1967." The information sheet contained a map of the Holy Lands, showing the places they would visit, and the following description of the trip:

SIX-WEEK EXPERIENCE IN CHRISTIAN GROUP LIVING

Visit the places where Jesus lived and walked. Visit and know young people of other backgrounds, cultures and religions. Share in an experience of Christian group living, understanding and friendship through work, travel, and worship.

ELIGIBILITY

Applications will be received from those Third Church young people who will finish the sophomore or junior year in high school in June, 1967. 25 young people will be chosen after careful interview by the selection committee.

TENTATIVE ITINERARY

Fly New York to Cairo. 5 days in Cairo area. Visit pyramids at Giza. Visits with Egyptian young people.

Fly Cairo to Jerusalem, Jordan. One week in Jerusalem. Includes trips within the old city, to Bethlehem, to Qumran (where the Dead Sea scrolls were found), and a swim in the Dead Sea.

Cross into Jerusalem, Israel. Two weeks working at a Kibutz [sic], one week working at an archeological dig, visits to Nazareth, Sea of Galilee, etc.

Fly to Athens, Greece. 5 days in Greece with visits with Greek young people.

Fly to Geneva, Switzerland. 5 days including stay at Lake Luzern, and trip into Alps. Visits with Swiss young people.

Fly Zurich to New York and home.

COST

We estimate the total cost of the trip will be around $1200.

Petitioner's son Benson was one of 42 teenagers who applied for the trip in response to the March 1966 mailing. The committee devised a screening procedure to determine which applicants would be selected to take part in the trip. Each applicant was required to fill out an application form and have a personal interview with the committee. The committee also obtained evaluation sheets on each teenager from his public school principal and the director of Third Church's choir.

The committee informed each applicant that if he was selected he would be expected to take part in a program to prepare him for the trip. The applicants were also told that they would have to take part in the physical labor required on the project and that, when they returned to Rochester, they would be expected to take an active part in Third Church's youth program for at least 1 year. The committee refused to accept applications from any teenager who would have graduated from high school before June of 1968.

In June of 1966, the committee sent letters to 27 teenagers informing them that they had been selected to take part in the trip. Petitioner's son was in this group. The factors the committee used in making its decision were the applicant's willingness to work and accept supervision and his willingness to become involved in Third Church's youth program after his return from the trip.

By the latter part of 1966, the committee found that it was unable to arrange work projects at a kibbutz or an archaeological dig in the Holy Lands. The committee then contacted Bruce Lansdale (hereinafter Lansdale), the director of the American Farm School (sometimes hereinafter the school), in Salonika, Greece, about a project there, and Lansdale agreed.

The school was established in 1902 by John Henry House. It provides basic academic courses and a vocational education in agriculture to children from the poor rural areas of Greece. These children are

generally 12- and 13-year-old boys. The school's purpose is to train the children so that when they return to their villages they can teach the farmers how to improve their farming practices.

Even though the school sells the crops and dairy products it produces, it is not self-supporting. It derives only about one-third of its finances from these sales. Since the average Greek farmer earns less than $100 per year, the school cannot turn to the parents of its students for assistance. An additional third of its money comes from the Greek Government, and the remainder is supplied through public contributions, mostly by Americans. Contributions to the school are deductible under section 170.

Third Church and its members for many years have assisted the school in raising funds. In 1964, Third Church sponsored a work project at the school and provided needed materials so that 27 teenagers from Third Church could make cement blocks which were later used to construct a building. Various organizations in the church have also been of assistance to the school. Lansdale visits Third Church almost every year to raise money for the school.

In the late spring of 1967, the trip's itinerary was changed when the State Department requested that American citizens avoid any unnecessary travel to the Middle East. On May 24, 1967, a letter was sent by Third Church to the teenagers' parents, informing them that the sightseeing segment of the trip scheduled for Egypt, Jordan, and Israel had been canceled because of the State Department's request. The letter stated that the proposed itinerary for the trip would be as follows:

We will fly directly to Rome, spend 5 days in Rome and vicinity and then 2 days in Venice. We will then fly to Istanbul for 3 days, see a part of the Moslem world and the center of Byzantine history and the Eastern Orthodox Church, then to Athens for 5 days with sightseeing trip including a hydrofoil ride to the beautiful Aegean Island of Hydra. The visit to the Farm School will be as previously planned. After we leave the Farm School we will go to Vienna and Budapest as planned and then on to Lake Lucerne with a trip through the Alps to Interlaken and Geneva. We then fly from Geneva to New York as planned.

In preparation for the trip, as it was proposed in the spring of 1966, the 27 teenagers met once a month starting in the fall of 1966. The purpose of the meetings was to bring the group closer together and to discuss the problems of group living under regimented conditions in unfamiliar surroundings. By the latter part of December 1966, the meetings were being held every Sunday evening. The meetings were 2 hours in duration and were generally devoted to discussing the language, customs, geography, and people of Israel, Jordan, and Egypt. After the site of the work project was changed from the Middle East to Greece, the meetings switched their discussions to cover Greece, Turkey, Italy, Hungary, and Austria.

On June 29, 1967, the 27 teenagers and their six adult leaders left Rochester, N.Y. The cost per teenager for the trip, including various incidental expenses, was $1,382.98. The breakdown of these expenses is as follows:

| | |
|---|---:|
| Air travel fare | $572. 30 |
| Land arrangements (meals and lodging) | 513. 00 |
| Pro rata share of six adult leaders' air travel fare and land arrangement expenses | 194. 28 |
| Room and board at Farm School's facility in Greece | 44. 40 |
| Miscellaneous expenses (stamps, bus rides, meals, airport taxes, etc.) | 59. 00 |
| Total | 1, 382. 98 |

Each parent paid Third Church $1,400, and in 1968 each received a refund of $17.02. Petitioner paid this amount at some unspecified date in 1967.

The air fare and land arrangements costs of the six adult leaders were paid by the parents of the teenage participants. The room and board expenses at the school included the costs of some staff members who supervised the work project. The air fare was based on a group rate, and the fare for the whole trip was the same as it would have been to fly directly to the school and then return to Rochester.

The group left Europe on their return trip on August 14, 1967. Their itinerary during the 46-day visit, as stipulated by the parties, was as follows:

| Date | Name of city, State, and country | Planned activities |
|---|---|---|
| 6/29/67 | Rochester, N.Y. | Leave for Rome, Italy. |
| 6/30/67 | Rome, Italy | None. |
| 7/1—7/3 | Rome, Italy | Morning and afternoon sightseeing tour on July 1, including St. Peters Cathedral, Vatican, Basilica of St. Paul, Colosseum, Catacombs. |
| 7/4—7/6 | Venice, Italy | None. |
| 7/7 | Istanbul, Turkey | None. |
| 7/8 | Istanbul, Turkey | One hour private audience with His All-Holiness, Athenagoras, Ecumenical Patriarch of the Orthodox Church. |
| 7/9 | Istanbul, Turkey | Visit to Monastery as guest of Patriarch Athenagoras. |
| 7/10 | Istanbul, Turkey | Morning bus tour of mosques, etc. Afternoon meeting with Turkish young people from local colleges. |
| 7/11 | Athens, Greece | Morning sightseeing of Metropolitan Cathedral, Byzantine Church of St. Eleftherios, etc. Afternoon at the Acropolis. |
| 7/12 | Athens, Greece | Bus tour to old City of Corinth, etc. |
| 7/13 | Athens, Greece | None. |
| 7/14 | Hydra, Greece | Visit to Church and Monastery of the Dormition of the Virgin, etc. |

| Date | Name of city, State, and country | Planned activities |
|------|----------------------------------|--------------------|
| 7/15—8/5 | Salonika, Greece | Three-week stay at American Farm School. |
| 7/23 | Meteora, Greece | Visited monasteries. |
| 7/30 | Cassandra, Greece | Participation by the teenagers in a Greek Orthodox mass in the Village Church. |
| 8/5 | Vienna, Austria | Meeting with members of American Community Church. |
| 8/6 | Vienna, Austria | None. |
| 8/7 | Budapest, Hungary | None. |
| 8/8 | Budapest, Hungary | Morning sightseeing as guests of official Communist travel agency. |
| 8/9 | Budapest, Hungary | Meeting with head of Communist Youth Movement in Hungary through arrangement made by the Hon. Karoly Csatorday of the Permanent Hungarian Mission to the United Nations. |
| 8/10 | Budapest, Hungary | None. |
| 8/11–8/12 | Luzern, Switzerland | Overnight stay in Luzern. Bus trip through Alps to Interlaken, Church service at Interlaken. |
| 8/13 | Geneva, Switzerland | Morning sightseeing—Reformation Movement, St. Peter's Cathedral, Russian Orthodox Church, etc. Afternoon visit to World Council of Churches including discussions with members of the Council's staff. |
| 8/14 | Geneva, Switzerland | Airline trip to Rochester, N.Y. |

The work project, performed with the assistance of staff members of the school, involved assistance in the contruction of a new fenced-in area for the school's chickens and relocating the chicken coops to the new area. The project required the digging of postholes 3 feet deep around the perimeter of the new area. In all, approximately 264 such holes were dug, and 12-foot wooden poles were installed.

To prevent the chickens from tunneling under the fence after the project was completed, trenches were dug along the rows of fence poles so that the bottom of the wire fencing could be buried. Two layers of 8-foot-high wire fencing, approximately 1,500 linear feet, were strung on the wooden poles. Sixteen chicken coops located about a quarter of a mile away were then loaded on a flatbed truck and transported to the new fenced-in area. A trench in front of the row of chicken coops was dug and a waterline was installed. Other jobs involved working in the vegetable gardens, painting or whitewashing the buildings, and helping in the construction of a cattle shelter.

The teenagers' work hours were usually 7 or 7:30 a.m. until shortly after midday. However, on several occasions the group worked beyond midday. While at the farm, they took two weekend excursions.

The completion of the new fenced-in area for the chickens and the relocation of the chicken coops were beneficial to the school.

OPINION

Section 170(a) allows as a deduction any "charitable contribution" paid within the taxable year, and section 170(c) defines the term "charitable contribution" to include gifts "to or for the use of" certain described organizations. The parties agree that both Third Church and American Farm School are organizations of the type described in section 170(c).

Petitioner does not contend that she made a direct cash contribution to either of these organizations. She urges, however, that both Third Church and the school received benefits from the expenditures which she made to send her son to Europe, that a portion of her expenditures is attributable to services which he performed at the school, and that she is entitled to a deduction for the expenses which were incurred in the performance of those services.

Section 1.170–2(a)(2), Income Tax Regs.,[2] provides that no deduction is allowable for the value of services contributed to a qualifying organization, but that "unreimbursed expenditures made incident to the rendition of services" to such an organization may constitute a deductible contribution. The issue is whether any of the expenses paid by petitioner for her son to take the European trip sponsored by Third Church are deductible under this provision.

Of the $1,382.98 spent for her son's trip to Europe, petitioner claims no deductions for the meals and lodging and miscellaneous expenses ($572) attributable to the period not spent at the American Farm School. However, she claims a deduction for the remainder of the expenses ($810.98), consisting of the entire cost of the air travel, a pro rata share of the entire expenses of the adult leaders, and the room and board at the school.

We think it apparent that a deduction for expenses incident to the performance of services for the school is not allowable as a charitable contribution to Third Church. Although the church had a history of assisting the school, these are two distinctly separate organizations, and the services were not performed for the benefit of the church. Cf. *S. E. Thomason*, 2 T.C. 441 (1943). That the trip increased the teenagers' interest in the church program, developed their leadership capabilities, and increased their religious understanding does not aid petitioner's cause. If the trip, indeed, produced these results, the true

---

[2] Sec. 1.170–2(a)(2). No deduction is allowable for contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in rendering donated services are deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of rendering donated services also are deductible. * * *

beneficiaries were the teenagers themselves. See *Arthur I. Saltzman*, 54 T.C. 722, 724–725 (1970).

Petitioner's principal contention is that the outlay of funds was "incident to the rendition of services" to the school within the meaning of the above-cited regulation. The burden of proving that her case falls within the regulation, of course, rests with petitioner, and we do not think she has carried that burden.

"Expenses incurred in the rendition of services to a qualified charitable organization may, and often do, have a dual character. They may benefit both the charity and the taxpayer." *Harris W. Seed*, 57 T.C. 265, 276 (1971); see also *Orr* v. *United States*, 343 F. 2d 553, 557 (C.A. 5, 1965); *Green* v. *Bookwalter*, 207 F. Supp. 866, 880 (W.D. Mo. 1962), affd. 319 F. 2d 631 (C.A. 8, 1963); cf. *Edward A. Murphy*, 54 T.C. 249, 254 (1970). The presence of a substantial, direct, personal benefit to the taxpayer or to someone else other than the charity is fatal to the claim for a charitable contribution. See *Harris W. Seed, supra* at 276. We think it apparent that the principal beneficiaries of the expenses here in question were petitioner and her son.

The evidence shows plainly that the 46-day expedition to Europe was primarily a vacation, sightseeing, and cultural trip for the teenagers. It was so advertised. The lengthy, initial announcement published in March 1966, quoted in our Findings, devoted only parts of two lines to the work phase of the trip: "Two weeks working at a Kibutz [sic], one week working at an archeological dig." Those work plans fell through mainly because no one wanted the teenagers' services. Significantly, it was the church's committee rather than the school that proposed the work project finally arranged. *Arthur I. Saltzman, supra* at 725. The clear inference from the testimony is that the director of the school accepted the "offer" of services, not for the benefit of the school but as an accommodation of the church, one of the school's important American benefactors. Significantly, Third Church's letter to the teenagers' parents of May 24, 1967, refers to the stay at the school as the "visit to the Farm School."

The procedure for the selection of individuals to make the trip was not based on ability to do farm labor. Rather, only teenagers in the 9th and 10th grades in school (ages about 14 and 15) were eligible to apply for the trip. Eligibility was limited to this group so that the participants would remain in the church community at least 1 year after going to Europe. None of the testimony indicates that work experience, aptitude, or interest in doing farmwork was even considered in the selection process, and the rules for eligibility were not altered in any way when the project was changed from work at a kibbutz and an archaeological dig to the American Farm School. The teen-

agers' preparation for the trip was devoted entirely to religious, cultural, and language studies and discussions on group living.

The evidence shows the teenagers, participating with an undisclosed number of the school's staff assistants, did some work, described in our Findings, which was beneficial to the school. Petitioner's witnesses attempted to portray the teenagers' work as a Spartan effort motivated by the benefit they were conferring on the school. We are not satisfied, however, that assistance to the school was the primary consideration.[3] Rather, we think the stay at the school was similar to participation in a traditional summer camp with incidental work assignments. As described in the church's letter of May 24, 1967, it was basically a "visit to the Farm School."

The 3 weeks spent at the school gave the teenagers and their adult leaders an opportunity to stay together as a group—described in the March 1966 announcement as "Christian group living"—and take weekend excursions to local points of interest. Instead of the expenditures in question being incident to the rendition of services, we think the visit to the school and the work which was performed were only incidental to, or part of, a vacation trip. There is nothing to suggest that the expenses would have been less if the group had spent the entire trip solely for sightseeing. *Edward A. Murphy, supra* at 254.

In summary, we are satisfied that the primary reason for the entire arrangement was a vacation trip to Europe, and the primary beneficiaries of the expedition were the teenagers rather than the school. While efforts to assist the teenagers in developing deeper religious involvement and concern for the needs of others are laudable, the tax laws do not permit parents to deduct sums which they expend for such purposes specifically on behalf of their own children. We hold that the disputed amount is not allowable as a deduction for "unreimbursed expenditures made incident to the rendition of services" to a charitable organization.

*Decision will be entered for the respondent.*

---

[3] Assuming expenses were incurred for each of the other teenagers in an amount equal to that claimed by petitioner, almost $22,000 was spent to supply this labor. Since the farmers in that area earned about $100 per year, the total expenditure by the group would have been sufficient to command almost 220 man-years of labor.