NELDA C. STARK, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10409-84.     Filed March 3, 1986.

*John G. Heard, Glen A. Rosenbaum*, and *James D. Penny*, for the petitioner.
*David W. Johnson*, for the respondent.

COHEN, *Judge*: Respondent determined a deficiency of $97,372.10 in petitioner's Federal income tax for 1975. Petitioner claimed an overpayment in an amended petition. The issues for decision are as follows: (1) Whether petitioner is entitled to a charitable contribution deduction with respect to certain real property in which she retained a mineral interest, and (2) if so, the proper amount of the charitable contribution deduction resulting from a bargain sale of certain real property.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner resided in Orange, Texas, at the time she filed her petition. She filed a Federal income tax return and an amended Federal income tax return for 1975 with the Internal Revenue Service Center in Austin, Texas.

For many years, petitioner owned a 3,358 acre tract of land in East Texas that the U.S. Forest Service (the Forest Service) wished to acquire for use as a public recreation area. In late 1972 and early 1973, the Forest Service purchased approximately 2,280 acres of such tract from petitioner. Because petitioner wanted the Forest Service to have the entire tract for public recreation use, she offered to sell the Forest Service the remaining land, which the parties erroneously believed to be 1,000 acres. The Land and Water Conservation Act of 1965 precluded the Forest Service from purchasing the additional land from petitioner, however, because the land was located outside the existing National Forest boundary. Moreover, petitioner did not wish to donate such land or exchange it for land owned by the Forest Service. The parties therefore decided to use a third party to purchase petitioner's land and make an exchange with the Forest Service.

The Forest Service proposed that Harris R. Fender (Fender), a person with whom petitioner had no prior business or other dealings, act as such third party. By letter dated April 12, 1972, petitioner agreed with the Forest Service to hold the 1,000 acre tract available for sale to Fender for use by him in the exchange with the Forest

Service. In the letter petitioner stated:

I understand the exchange procedure will require considerable time to allow the Forest Service and Mr. Fender to work out all details of the transaction. * * *

I will hold the 1,000 acres available for a reasonable time, but not beyond the first day of June 1973, for sale to Mr. Fender to be used by him in the proposed exchange with the Forest Service, but if the sale has not been completed on or before June 1, 1973, any obligation I may have to sell the property shall, at my election, terminate.

> \*      \*      \*      \*      \*      \*      \*

It is understood that I have absolutely no connection with the proposed exchange other than the sale of the 1,000 acres for a previously specified consideration and my wish that the Forest Service have the additional 1,000 acres to be used as a part of its proposed recreation area.

The "previously specified consideration" referred to in the letter was $1,200,000.

Although Fender and the Forest Service did not complete negotiations by June 1, 1973, petitioner continued to give oral and written extensions of the agreement to hold the land available for the proposed transaction. Fender and the Forest Service ultimately agreed upon the terms of the exchange in 1975, and Forest Service officials in Washington, D.C., approved the transaction. Prior to that time, certain land brokers told petitioner that they could sell the land for more than $1,200,000; but petitioner refused to consider any other potential buyers while the Forest Service continued preparation for its acquisition.

A survey of the land prior to consummation of the transaction revealed that the tract contained 1,079 acres. Because petitioner and Fender had agreed upon a sale of only 1,000 acres, the Forest Service requested that petitioner donate to it the excess contained in the tract. The parties ultimately agreed that petitioner would donate 77.28 acres to the Forest Service and that Fender would purchase 1,001.72 acres from petitioner for simultaneous exchange with the Forest Service. On October 16, 1975, petitioner conveyed 77.28 acres to the Forest Service (i.e., to the United States of America) for no consideration and conveyed 1,001.72 acres to Fender for $1,200,000.

Petitioner would not have sold the land to Fender had Fender not been obligated to reconvey the land to the Forest Service for use as a public recreation area. Petitioner had no knowledge of the location, size, description, fair market value, or other characteristics of the land to be conveyed to Fender by the Forest Service in the exchange.

Petitioner's family had a long-standing business practice of never conveying mineral interests together with the conveyance of surface real estate interests. Based on this policy, petitioner retained, in the deeds of conveyance to the Forest Service and to Fender, the interest in all minerals in the land and the right to enter the land to prospect for, mine, and remove such minerals for 25 years. The reservation in the deeds was subject to the following restrictions:

(1) Whoever undertakes to exercise the reserved rights shall give prior written notice to the Forest Service and shall submit satisfactory evidence of authority to exercise such rights. Only so much of the surface of the lands shall be occupied, used or disturbed as is necessary in bona fide prospecting for, drilling, mining (including the milling or concentration of ores), and removal of the reserved minerals, oil, gas or other inorganic substances.

(2)(i) None of the lands in which minerals are reserved shall be so used, occupied or disturbed as to preclude their full use for authorized programs of the Forest Service until the record owner of the reserved rights, or the successors, assigns or lessees thereof, shall have applied for and received a permit authorizing such use, occupancy or disturbance of those specifically described parts of the lands as may reasonably be necessary to exercise of the reserved rights.

(ii) Said permit shall be issued upon agreement as to conditions necessary to protect the interest of the United States including such conditions deemed necessary to provide for the safety of the public and other users of the land, and upon initial payment of the annual fee, which shall be at the rate of $2.00 per acre or fraction of acre included in the permit.

(iii) The permit shall also provide that the record owner of the reserved right or the successors, assigns or lessees thereof, will repair or replace any improvements damaged or destroyed by the mining operations and restore the land to a condition safe and reasonably serviceable for authorized programs of the Forest Service, and shall provide for a bond in sufficient amount as determined necessary by the Forest Service to guarantee such repair, replacement or restoration.

(iv) Failure to comply with the terms and conditions of the aforesaid permit shall be cause for termination of all rights to use, occupy or disturb the surface of the lands covered thereby, but in event of such termination, a new permit shall be issued upon application when the

causes for termination of the preceding permit have been satisfactorily remedied and the United States reimbursed for any resultant damage to it.

(3) All structures, other improvements and materials shall be removed from the lands within one year after date of termination of the aforementioned permit. Should the holder of the permit fail to do so within the specified time, the Forest Service may remove, destroy or otherwise dispose of said structures, other improvements and materials at the permittee's expense or in lieu thereof, may upon written notice to the permittee, assume title thereto in the name of the United States.

(4) Timber and/or young growth cut or destroyed in connection with exercise of the reserved right shall be paid for at rates determined by the Forest Service to be fair and equitable for comparable timber and/or young growth in the locality. All slash resulting from cutting or destruction of timber or young growth shall be disposed of as required by the Forest Service.

(5) In the prospecting for, mining, and removal of reserved minerals, oil, gas or other inorganic substances, all reasonable provisions shall be made for the disposal of tailings, dumpage, and other deleterious materials or substances in such manner as to prevent obstruction, pollution or deterioration of water resources.

(6) Nothing herein contained shall be construed to exempt operators or the mining operations from any requirements of applicable State Laws, nor from compliance with or conformity to any requirement of any law which later may be enacted and which otherwise would be applicable.

(7) While any activities and/or operations incident to the exercise of the reserved rights are in progress, the operators, contractors, subcontractors and any employees thereof shall use due diligence in the prevention and suppression of fires and shall comply with all rules and regulations applicable to the land.

Oil and gas exploration and drilling would not interfere with the Forest Service's administration of the property. As of the date of the conveyances, however, there were no known deposits of oil, gas, or other minerals on or beneath the land. Property located approximately 35 miles to the south of the land was the nearest property producing oil and gas. Dry holes existed to the north, west, and east of the land conveyed by petitioner. The land possessed a hilly terrain not conducive to the transportation and operation of a drilling rig. As of October 1975, the likelihood that the property would be a prospect for any type of mineral exploration for production was negligible.

The fair market value of the surface interest in the land conveyed by petitioner was $1,800 per acre as of the date of conveyance. On such date, the fair market value of the

mineral interest retained by petitioner was between $1 and $2 per acre, taking into account the restrictions contained in the deeds.

Contemporaneously with petitioner's conveyance of the 1,001.72-acre tract to Fender, Fender exchanged such land for Forest Service land possessing a fair market value of $1,690,300.

On her 1975 Federal income tax return, petitioner claimed a $139,103 charitable contribution deduction, representing the fair market value of the surface interest of the 77.28 acres donated to the Forest Service. On her 1975 amended Federal income tax return, petitioner claimed an additional $536,917.75 charitable contribution deduction and a $63,082.25 charitable contribution deduction carryover, resulting from the sale of the surface interest in the 1,001.72 acres to Fender, who conveyed the property to the Forest Service in the prearranged transaction.

Respondent denied all charitable contribution deductions claimed by petitioner with respect to the land because petitioner did not transfer her entire interest in the land.

## OPINION

The threshold issue before us is whether petitioner's retention of a mineral interest in the 77.28 acres of land donated to the Forest Service and the 1,001.72 acres sold to Fender for exchange with the Forest Service precludes any charitable contribution deduction with respect to such land. Respondent concedes that if petitioner's deduction is not so precluded, petitioner is entitled to deductions of $139,103 with respect to the donated land, which equals the stipulated fair market value of the surface rights of such land, and of $109,700 with respect to the land sold, which equals the difference between the stipulated value of the surface rights of such land and the stipulated value of the land received by Fender from the Forest Service in the exchange. Petitioner contends that the amount of the charitable contribution deduction with respect to the land sold is $600,000, which equals the difference between the stipulated value of such land and the $1,200,000 sales price received from Fender. Thus, if we decide in favor of petitioner on the first issue, we must further determine the proper amount of

the charitable contribution deduction resulting from the bargain sale of the 1,001.72 acres.

## Issue 1: Retention of Mineral Interest

Section 170(a)[1] allows a deduction for any charitable contribution made during the taxable year. Under section 170(c), the term "charitable contribution" includes a contribution or gift to or for the use of the United States, if such contribution or gift is made for exclusively public purposes. Respondent asserts that section 170(f)(3)(A), which prohibits a deduction for the contribution of partial interests in property, is applicable to both conveyances in issue. That section provides:

(A) IN GENERAL.—In the case of a contribution (not made by a transfer in trust) of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this section if such interest had been transferred in trust. For purposes of this subparagraph, a contribution by a taxpayer of the right to use property shall be treated as a contribution of less than the taxpayer's entire interest in such property.

Prior to 1969, taxpayers could deduct the contribution to charity of the right to use property. Concluding that such taxpayers received an undesirable "double benefit," Congress added section 170(f)(3) to the Code in the Tax Reform Act of 1969, Pub. L. 91-172, sec. 201(a), 83 Stat. 487, 549. Congress described the purpose behind section 170(f)(3) as follows:

*General reasons for change.*—An individual receives what may be described as a double benefit by giving a charity the right to use property which he owns for a given period of time. For example, if the individual owns an office building, he may donate the use of 10 percent of its rental space to a charity for 1 year. As a result, he may report for tax purposes 90 percent of the income which he otherwise would have had if the building was fully rented, and may claim a charitable deduction (amounting to 10 percent of the rental value of the building) which offsets his reduced rental income. He, therefore, may exclude 10 percent of the amount which would have been included in his income if

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.

the property had been rented to a noncharitable party. [H. Rept. 91-413 (1969), 1969-3 C.B. 200, 237.]

Accord S. Rept. 91-552 (1969), 1969-3 C.B. 423, 477.

Section 170(f)(3) is considerably broader in scope than Congress' articulated purpose. By its terms paragraph (A) of the section applies to contributions of less than the taxpayer's entire interest in property, including, but not limited to, contributions of the right to use property.

Paragraph (B)(ii) of section 170(f)(3), added by a Senate amendment to the original House bill (see S. Rept. 91-522, *supra,* 1969-3 C.B. at 477), excepts from paragraph (A) the contribution of "an undivided portion of the taxpayer's entire interest in property."[2] In interpreting this exception, section 1.170A-7(b)(1)(i), Income Tax Regs., provides in relevant part:

(1) *Undivided portion of donor's entire interest.* (i) A deduction is allowed under section 170 for the value of a charitable contribution not in trust of an undivided portion of a donor's entire interest in property. An undivided portion of a donor's entire interest in property must consist of a fraction or percentage of each and every *substantial* interest or right owned by the donor in such property and must extend over the entire term of the donor's interest in such property and in other property into which such property is converted. * * * [Emphasis supplied.]

Both petitioner and respondent cite revenue rulings in support of their respective positions. Petitioner relies primarily upon Rev. Rul. 75-66, 1975-1 C.B. 85; Rev. Rul. 77-148, 1977-1 C.B. 63; and Rev. Rul. 75-373, 1975-2 C.B. 77. Respondent relies upon Rev. Rul. 76-331, 1976-2 C.B. 52. Both parties assert that revenue rulings "should be given weight" in this Court under *Bob Jones University v. United States,* 461 U.S. 574 (1983); *Macey's Jewelry Corp. v. United States,* 387 F.2d 70 (5th Cir. 1967); and *Neuhoff v. Commissioner,* 75 T.C. 36 (1980), affd. 669 F.2d 291 (5th Cir. 1982).

Absent special circumstances, a revenue ruling merely represents the Commissioner's position with respect to a

[2]Par. (B)(i) provides a similar exception for a remainder interest in a personal residence or farm. In the Tax Reform Act of 1976, Pub. L. 94-455, sec. 2124(e)(1), 90 Stat. 1520, 1919, Congress added pars.(B)(iii), (iv), and (C), providing exemptions for certain contributions for conservation purposes. See also Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, sec. 309, 91 Stat. 126, 154 (requiring that interests so contributed be perpetual). Congress replaced these latter exceptions in 1980 with an exception for a "qualified conservation contribution." See *infra* note 5 and accompanying text.

specific factual situation. See *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2d 1142, 1146-1147 (5th Cir. 1971); *Crow v. Commissioner*, 85 T.C. 376, 389 (1985), and cases cited therein. We find nothing in the cases cited by the parties that undermines this well-established principle. Whereas this Court or any other court may adopt the conclusion and rationale of a revenue ruling, revenue rulings typically do not constitute substantive authority for a position. As we stated in *Neuhoff v. Commissioner*, 75 T.C. at 46:

> A revenue ruling does not constitute authority for deciding a case in this Court. We would decide this issue irrespective of the existence or nonexistence of a revenue ruling. We agree with the Court of Appeals for the Second Circuit in *Bankers Trust Co. v. Commissioner, supra,* and we agree with the conclusion reached in Rev. Rul. 76-68, not because we rely upon it for authority, but because we conclude it is correct. Cf. *Ludwig v. Commissioner*, 68 T.C. 979 (1977).

Thus, while we shall examine the above revenue rulings, the conclusions reached in this case are our own.[3]

In Rev. Rul. 75-66, *supra*, the taxpayer donated his entire interest in 800 acres of land to the United States but retained the right during his lifetime to train his personal hunting dogs on trails extending over the entire tract, including the right to maintain paths and lanes relating to the reserved use. The U.S. Department of Interior informed the taxpayer that the reservation would not interfere with the Government's use and enjoyment of the property, and the taxpayer used the trails in accordance with Department of Interior regulations. Relying upon section 1.170A-7(b)(1)(i), Income Tax Regs., the Commissioner concluded:

> section 1.170A-7(b)(1)(i) of the regulations is complied with if the only rights retained by the donor are insubstantial. In the instant case, the retained right during the taxpayer's lifetime to train his personal hunting dog on the entire tract, in accordance with the regulations of the Department of the Interior on such use, is not substantial enough to affect the deductibility of the property contributed. [1975-1 C.B. at 86.]

---

[3] In *Silco, Inc. v. United States*, 779 F.2d 282 (5th Cir. 1986), the Fifth Circuit Court of Appeals, to which this case is appealable, held that the taxpayer was entitled to rely upon a revenue ruling that provided "the only insight available to * * * [the] taxpayer at the time of the * * * transaction as to the conceptual approach the IRS would use to determine the tax consequences." 779 F.2d at 287. See Statement of Procedural Rules, 26 C.F.R. sec. 601.601(d)(2)(v)(*e*). While *Silco* supports our holding herein, we rely upon our own analysis of the substantive issue.

Rev. Rul. 76-331, *supra*, presented two fact situations, the first of which involved a corporation that donated a tract of land but retained all mineral rights, including the sole right to exploit and sell any minerals obtained from the property. The ruling contained no specific facts regarding the land or the retained mineral interest. After stating the "insubstantiality rule" articulated in Rev. Rul. 75-66, *supra*, the ruling concluded:

In *Situation* 1, the corporation retained all mineral rights to the land and had the sole right to exploit and sell the minerals. * * * Thus, * * * the taxpayer retained a substantial interest or right in the property and cannot be considered as donating an undivided portion of the taxpayer's entire interest in the property. [1976-2 C.B. at 53.]

We hold that the "insubstantiality rule" expressed in Rev. Ruls. 75-66 and 76-331 represents an accurate legal conclusion. Where the interest retained by the taxpayer is so insubstantial that he has, in substance, transferred his entire interest in the property, the tax treatment should so reflect. Such a taxpayer satisfies the original congressional purpose behind section 170(f)(3), and under section 1.170A-7(b)(1)(i), Income Tax Regs., a minor deviation from a literal application of the statute is appropriate.

To be entitled to any deduction, the taxpayer must prove that her situation comes within a particular statutory provision. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934). We therefore construe the insubstantiality rule narrowly. See *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134 (1974). A charitable contribution deduction should be allowed only where the retained interest has a de minimis value. Cf. *E.I. duPont de Nemours & Co. v. United States*, 432 F.2d 1052, 1055 (3d Cir. 1970), where, in determining whether the transfer of patent rights constituted a sale, the court stated, "To determine whether the taxpayer did transfer all of the *substantial* rights in the patents in question, the key question is whether the transferor retained any rights which, in the aggregate, have substantial *value*." (Emphasis supplied.)[4] Moreover, the insubstantial retained interest

---

[4]*E.I. duPont de Nemours & Co. v. United States*, 432 F.2d 1052 (3d Cir. 1970), involved a corporate transferor of patent rights. Sec. 1235 and sec. 1.1235-2(b), Income Tax Regs., were therefore inapplicable. See 432 F.2d at 1054.

must not potentially interfere in any manner with the donee's interest. Thus, consistent with Rev. Rul. 76-331, the retention of a mineral interest in the contributed property typically precludes any deduction.

The present case, however, does not involve such an unlimited retention of mineral rights. Pursuant to Department of Agriculture regulations in force on the date of the conveyances (36 C.F.R. sec. 251.15), the mineral interest retained by petitioner through the deeds of conveyance was subject to substantial restrictions which precluded petitioner's retained interest from ever interfering with the Forest Service's interest. These regulations were issued under 16 U.S.C. sec. 518 (1982), which provides that the acquisition of land by the United States for Forest Service use shall not be defeated by reservations that, in the opinion of the Secretary of Agriculture, will interfere with such use and requires expression of the regulations in the instrument of conveyance.

There existed no known deposits of any minerals on or under the land. Geneos P. Cokinos, petitioner's expert witness and a geological engineer possessing substantial experience and expertise with minerals in East Texas, concluded that the likelihood that the property would be a prospect for any type of mineral exploration for production was "very negligible." Cokinos based his conclusion primarily upon geological concerns: An examination of various geological reports indicated that no oil or gas had been found near the property and the property was virtually surrounded by dry holes. Cokinos also conducted a physical inspection of the property, which indicated that the hilly terrain would not easily accommodate a drilling rig and that it was unlikely that the property contained any other (nonpetroleum) minerals. Respondent presented no evidence of his own on this issue. Indeed, respondent stipulated that the value of the limited mineral interest retained by petitioner was between $1 and $2 per acre, whereas the stipulated value of the transferred surface rights was $1,800 per acre at the time of the transfer. This stipulation shows that the value of the retained mineral interest was de minimis.

Respondent's position herein is, in effect, that the retention of any mineral interest is per se the retention of a substantial interest. Yet, subsequent to the year in issue, both Congress and the Commissioner recognized a de minimis exception to the general rule.

In the Temporary Tax Provisions, Extension, Pub. L. 96-541, sec. 6, 94 Stat. 3204, 3206 (1980), Congress added section 170(f)(3)(B)(iii) and (h) to the Code, which allows a deduction for a "qualified conservation contribution" despite the retention of any mineral interest, substantial or insubstantial.[5] Congress described "present law" as follows:

The undivided interest exception * * * [does] not * * * extend to situations where taxpayers transferred their fee interest in property to a charitable organization while retaining *valuable* mineral rights.

Compare Rev. Rul. 76-331, 1976-2 C.B. 52 with Rev. Rul. 77-148, 1977-1 C.B. 63 and Rev. Rul. 75-373, 1975-2 C.B. 77. [S. Rept. 96-1007, at 9 (1980), 1980 U.S. Code Cong. & Adm. News 6736, 6744-6745. Emphasis supplied.]

In Rev. Rul. 77-148, 1977-1 C.B. 63, the Commissioner concluded that the taxpayer was entitled to a deduction for land contributed to the United States, despite the retention of a mineral interest exploitable only upon an advance finding by the Secretary of the Interior that such exploitation was in the national interest. Purporting to apply section 1.170A-7(a)(3), Income Tax Regs.,[6] the ruling concluded:

in effect, the corporation's exercise of its mineral * * * rights is conditioned upon the approval of the ultimate donee, the United States Government. The possibility that it will grant such approval is so remote as to be negligible, since, on the date of the gift, the United States planned to use the property as a wildlife preserve. [1977-1 C.B. at 64.]

Section 1.170A-7(a)(3), Income Tax Regs., seemingly applies not to retained present interests but to powers of termination, possibilities of reverter, and similar retained future interests which might defeat the present interest

---

[5] In the Tax Reform Act of 1984, Pub. L. 98-369, sec. 1035, 98 Stat. 494, 1042, Congress amended this provision generally to prohibit the possibility of surface mining.

[6] (3) A deduction shall not be disallowed under section 170(f)(3)(A) and this section merely because the interest which passes to, or is vested in, the charity may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the possibility that such act or event will occur is so remote as to be negligible. See paragraph (e) of sec. 1.170A-1. [Sec. 1.170A-7(a)(3), Income Tax Regs.]

transferred to the charity. See *Briggs v. Commissioner*, 72 T.C. 646 (1979), affd. without published opinion 665 F.2d 1051 (9th Cir. 1981); sec. 1.170A-1(e), Income Tax Regs.[7] The holding of Rev. Rul. 77-148 is nevertheless consistent with our holding herein based upon the insubstantiality of the interest retained by petitioner. Moreover, analytically implicit in the ruling is that the retained mineral interest was not substantial under section 1.170A-7(b)(1)(i), Income Tax Regs. Otherwise the taxpayer would be entitled to no deduction, regardless of the applicability of the former regulation.[8]

On the facts of the present case, we conclude that the mineral interest retained by petitioner was not a "substantial interest or right" within the meaning of section 1.170A-7(b)(1)(i), Income Tax Regs. Petitioner is therefore entitled to a deduction of $139,103 with respect to the 77.28 donated acres, and we must consider the second issue with respect to the 1,001.72 acres sold to Fender.

## Issue 2: Bargain Sale

Petitioner conveyed the 1,001.72 acres worth $1,800,000 to Fender for $1,200,000. Fender simultaneously exchanged the land for Forest Service land worth $1,690,300. The issue before us is the proper amount of petitioner's charitable contribution deduction resulting from this bargain sale. Petitioner contends that the deduction should be the difference between the fair market value of the 1,001.72 acres and the sales price received by her ($600,000), whereas respondent argues that petitioner's deduction should be limited to the difference between the fair market value of the land sold and the fair market value of the land that the Forest Service exchanged therefor ($109,700).

A taxpayer who makes a bargain sale to charity is typically entitled to a charitable contribution deduction

---

[7] See generally T. Bergin & P. Haskell, Preface to Estates in Land and Future Interests 64-68 (1966).

[8] Rev. Rul. 75-373, 1975-2 C.B. 77, also relied upon by petitioner, involved the retention of a mineral interest where the taxpayer contributed an open space easement in gross in perpetuity. Sec. 1.170A-7(b)(1)(ii), Income Tax Regs., specifically provides that the contribution of such an easement "shall be considered a contribution of an undivided portion of the donor's entire interest in the property to which section 170(f)(3)(A) does not apply." See also H. Rept. 91-782 (Conf.) (1969), 1969-3 C.B. 644, 654. Rev. Rul. 75-373 therefore is not relevant to the present case.

equal to the difference between the fair market value of the property and the amount realized from the sale. See *Knott v. Commissioner*, 67 T.C. 681 (1977); *Waller v. Commissioner*, 39 T.C. 665, 677 (1963).

Like any purported charitable contribution, however, a sale for less than full consideration results in a deduction under section 170 only if the statutory requirements are satisfied. In the present case, petitioner is entitled to a deduction only if she made the bargain sale "to or for the use of" the United States and "for exclusively public purposes." Sec. 170(c)(1). Whether these requirements are satisfied depends primarily upon the intent of the donor under a standard similar to that articulated in *Commissioner v. Duberstein*, 363 U.S. 278 (1960). Only where the taxpayer's actual motivation is to benefit the charitable organization and not himself or some other nonqualifying person is he entitled to a deduction. See *Knott v. Commissioner*, 67 T.C. at 689; *Tate v. Commissioner*, 59 T.C. 543, 549-550 (1973); *Sutton v. Commissioner*, 57 T.C. 239, 242-243 (1971); *Kluss v. Commissioner*, 46 T.C. 572, 575 (1966); and cases cited therein. The taxpayer who negotiates for the best terms he can obtain in a commercial transaction cannot subsequently claim a deduction based upon any excess value of the "contributed" property over the consideration received therefor. *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 604 (1980); *Grinslade v. Commissioner*, 59 T.C. 566, 577 (1973).

Petitioner's true intention when she conveyed the land to Fender for $600,000 less than its fair market value is not absolutely clear. The parties stipulated that petitioner wished that the Forest Service acquire the land for use as a public recreation area. The land may have been worth only $1,200,000 in 1972, however, when the parties first agreed upon a sales price. Although petitioner was not bound to the original terms throughout the ensuing 3-year period and was told that other potential buyers might pay more than $1,200,000, her willingness to convey the land for less than its full value could have been based upon genuine donative intent, a perceived moral obligation, ignorance of the magnitude of the subsequent increase in value, inertia, or some other factor. The only reasonably certain conclusion to

be drawn is that she did *not* intend to confer on Fender a $490,300 windfall.

We need not further explore the precise nature of petitioner's mental state, however, to resolve the case before us. Respondent's concession that petitioner is entitled to a deduction based upon the bargain sale, although lower in amount than that claimed by petitioner, necessarily implies that petitioner possessed the requisite "charitable" intention. We cannot conclude that petitioner had such intent only with respect to the $109,700 benefit ultimately realized by the Forest Service and not the $490,300 benefit apparently inuring to Fender. Petitioner had no knowledge of the value, or any other characteristics, of the property to be conveyed by the Forest Service to Fender. Any reasonable person in petitioner's situation who intended to confer a benefit upon the Forest Service would presume that the Forest Service would accept such benefit and not divert a substantial part of it to a private third party. Petitioner's deduction should not be limited based on any lack of donative intent.

Respondent's primary argument is that petitioner's deduction is limited to the benefit to the Forest Service, which he concludes is $109,700. He implies that petitioner's contribution was not completed until Fender transferred the land to the Forest Service in the exchange.

With respect to the latter argument, petitioner would not have sold the land to Fender had Fender not been obligated to transfer it to the Forest Service. Indeed, petitioner initially proposed to sell the land directly to the Forest Service. The Forest Service asked petitioner to convey the land to Fender and thereby accomplish indirectly what, under the Land and Water Conservation Act, could not be accomplished directly. Consistent with the terms of petitioner's April 12, 1972, letter, when petitioner conveyed the land to Fender, she placed it beyond her control. Her contribution to the Forest Service was therefore complete at that time. *Guest v. Commissioner*, 77 T.C. 9, 16-17 (1981), citing *Dulin v. Commissioner*, 70 F.2d 828 (6th Cir. 1934). Cf. *Garcia v. Commissioner*, 80 T.C. 491 (1983), and cases cited therein.

With respect to respondent's argument based upon the benefit to the Forest Service, one might conclude that petitioner conferred a $600,000 benefit upon the Forest Service when she conveyed the land to Fender. Although the Forest Service ultimately did not retain the full benefit, petitioner placed the Forest Service in a position to negotiate an exchange with Fender that reflected the consideration to be paid to petitioner. Although the record is not clear as to whether the Forest Service had actual knowledge of the $1,200,000 price,[9] it certainly could have and should have determined the price before settling upon an exchange with Fender. We thus reject respondent's assertion that petitioner and not the Forest Service should have made certain that the Forest Service received its "money's worth" in the transaction. We again emphasize that the *Forest Service* initially asked petitioner to sell the property to Fender.

Moreover, even if the benefit conferred upon the Forest Service by petitioner were only $109,700, the amount ultimately retained by it, petitioner is nevertheless entitled to the full $600,000 deduction. In *McGuire v. Commissioner*, 44 T.C. 801 (1965), we held that the taxpayer was entitled to a deduction for the fair market value of property donated to charity, even though the charity soon thereafter sold the property for less than that value. We stated as follows:

> It may be argued that the hospital ultimately received for its use only the proceeds of sale and that this should be taken into consideration in determining the amount of the allowable deduction. But until, or unless, the law limits the deduction for charitable contributions to the value of the contributions *to the charity*, which we cannot find that it presently does, we must determine the amount of the deduction allowable by determining the fair market value of the particular property donated. [44 T.C. at 810. Emphasis in original.]

Respondent cites *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 600-604 (1980), in support of his position that petitioner's deduction should be limited to the ultimate benefit to the Forest Service. The taxpayer in *Southern Pacific* sold land to the Post Office Department in

---

[9]We are not persuaded by the testimony of the Forest Service employee who negotiated the transaction.

an arm's-length commercial transaction. Although the taxpayer also transferred a depot on the land to the Post Office, the Post Office refused to pay any consideration for the depot and indicated to the taxpayer that it intended to demolish the depot after the transfer. In denying the taxpayer a charitable contribution deduction based upon the asserted bargain sale of the depot, we concluded:

> The depot was actually a liability; before the Post Office could use the site for its intended purpose, it had to have the structure demolished. More than likely, any benefit resulting from the transfer inured to petitioner, given the fact that petitioner was saved the expense of razing the depot * * * [75 T.C. at 603-604.] * * *

Moreover, we held in *Southern Pacific* that the taxpayer lacked the necessary intention to benefit the donee. 75 T.C. at 604. *Southern Pacific* is therefore inapplicable to the present case. Respondent finally asserts: "The claim of a charitable deduction based on a bargain sale is, frankly, an after-thought not intended or considered at the time of the sale." Respondent apparently believes that petitioner's failure to claim a deduction for the bargain sale on her original income tax return for 1975 indicates that petitioner lacked the necessary donative intent at the time of the sale. He cites no policy reason or authority for this position. As discussed above, it is inconsistent with his allowing petitioner any deduction. Moreover, petitioner's action only indicates that she was not preoccupied with the tax benefits from the transaction and lends credibility to her present contentions. Cf. *Knott v. Commissioner*, 67 T.C. 681, 691-692 (1977). "The parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter." *Commissioner v. Duberstein*, 363 U.S. 278, 286 (1960). We have considered the other arguments raised by the parties and found them either unpersuasive or unnecessary to our decision. Petitioner made a charitable contribution of $600,000 upon the bargain sale of the 1,001.72 acres. She accordingly made an overpayment in her 1975 taxes. Because the record indicates that

petitioner's deduction will be subject to percentage-of-income limitations,

*Decision will be entered under Rule 155.*