HENRY J. KNOTT AND MARION I. KNOTT, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

SEVERN RIVER CONSTRUCTION COMPANY AND SUBSIDIARY
COMPANIES, PETITIONERS *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 4010–73, 4011–73.   Filed January 18, 1977.

*Theodore W. Hirsh, Jacques T. Schlenger,* and *Harry D. Shapiro,* for the petitioners.
*Andre P. Fogarasi,* for the respondent.

WILES, *Judge:* Respondent determined deficiencies in petitioners' income taxes and additions to tax under section 6653(a)[1] as follows:

| Petitioner | Taxable Year Ending | Deficiency | Additions to tax under sec. 6653(a) |
|---|---|---|---|
| Henry J. and Marion I. Knott | Dec. 31, 1968 | $193,887.16 | $9,694.36 |
|  | Dec. 31, 1969 | 244,154.38 | 12,207.72 |
| Severn River Construction Co. and subsidiaries[1] | Aug. 31, 1968 | 152,450.23 |  |
|  | Aug. 31, 1969 | 165,494.83 |  |

[1] Severn River Construction Co. filed a consolidated return for the years in question with its subsidiary corporations: Glen Village, Inc., Kent Forest, Inc., Glenlo Corp., Northbrook Apartments, Inc., and Hillsworth Corp.

[1] Unless otherwise indicated all statutory references are to the Internal Revenue Code of 1954.

We must decide whether four real estate sales made for less than adequate consideration by Severn River Construction Co. (hereinafter Severn), and its subsidiaries to the Henry J. and Marion I. Knott Foundation, Inc. (hereinafter the foundation), a charitable organization, should be characterized as charitable contributions in the form of bargain sales or whether the real estate sales should be characterized as constructive dividends to Henry J. and Marion I. Knott, Severn's sole shareholders, followed by constructive charitable contributions to the foundation. All other issues were settled prior to trial or conceded on brief.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Henry J. Knott and Marion I. Knott (the Knotts), husband and wife, resided in Baltimore, Md., when they timely filed their joint income tax returns for 1968 and 1969 with the Internal Revenue Service Center, Philadelphia, Pa., and when they filed their petition with this Court.

Severn and its subsidiaries, all Maryland corporations with their principal places of business in Baltimore, Md., filed consolidated corporate income tax returns for fiscal years ending August 31, 1968, and August 31, 1969, with the Internal Revenue Service Center, Philadelphia, Pa.

These cases involve transactions between petitioners Henry J. and Marion I. Knott, petitioners Severn River Construction Co. and its subsidiary corporations, and the Henry J. and Marion I. Knott Foundation, Inc.

Henry J. and Marion I. Knott, Severn's sole shareholders, have an impressive interest in charities, charitable giving, and charitable activities, and hold a strong and sincere belief that it is the duty of individuals and organizations to

---

[2] Petitioners concede the application of the accumulated earnings tax in the event Severn and its subsidiaries are not allowed charitable contribution deductions under sec. 535(b)(2); petitioners concede the application of the negligence penalty under sec. 6653(a); if we determine the Knotts constructively received dividends, respondent concedes that Severn, in calculating its accumulated taxable income, may reduce its taxable income under sec. 535(a) by the amount of the constructive dividend distribution; finally, respondent concedes that petitioners may adjust their accumulated earnings under sec. 535(b)(1) by the amount of corporate income tax adjustments accrued in fiscal years 1968 and 1969, and not contested.

encourage charitable work. During the period 1960 to 1970, Mr. Knott served on the committees and boards of the following charitable and civic organizations:

Archdiocesan Finance Committee...........................Committee member
Archdiocesan Insurance Committee .......................Committee member
Baltimore Airport Board..........................................Committee member
Baltimore Efficiency & Economy Committee........Director
Baltimore State Office Complex ..............................Committee member
Baltimore Symphony Orchestra ..............................Director and treasurer
Bon Secours Hospital................................................Trustee
Building Congress and Exchange ............................President and director
Chamber of Commerce ..............................................Director
Columbia Inter-Faith Housing.................................Member of board of directors
Good Samaritan Hospital..........................................Trustee
Governor's Operating Economic Survey ...............Committee member
Homebuilders' Association........................................President and director
Human Life Foundation............................................Member of board
Johns Hopkins Hospital ...........................................Trustee and member of
                                                                                    building committee
Mt. St. Mary's College ..............................................Trustee
National Conference of Christians and Jews........Chairman of committee
United Community Chest ..........................................Trustee
Union Memorial Hospital .........................................Member of building
                                                                                    committee
Governor's Special Commission on Life
     Preservation............................................................Committee member
State Aid Group for Education ................................Committee member
Associated Catholic Charities..................................Trustee
Governor's Commission for Higher Education .....Committee member

Additionally, the Knotts have made extensive charitable gifts, frequently in excess of the deduction allowable under section 170. On one occasion, Mr. Knott made a gift in excess of several million dollars to a local university and hospital for which no deduction was taken. Consistent with their charitable attitude, the Knotts never allow their name to be publicly connected with their gifts.

Severn, formed by the Knotts in 1950, was organized to develop, conduct, and operate a construction and real estate business in Maryland. During the tax years in question, Severn's officers were petitioners Henry J. and Marion I. Knott, president and treasurer, respectively; the Knotts' son-in-law, John Riehl III, vice president; C. Edward Jones, an attorney who advised the Knotts on various legal matters, vice president; and Katherine A. Dohony, secretary. Henry J. Knott served as president of Severn without receiving any compensation.

For taxable years ending August 31, 1968, and August 31, 1969, Severn owned all the outstanding stock of Kent Forest, Inc., Glenlo Corp., and Northbrook Apartments, Inc. (hereinafter Northbrook). Additionally, during the tax years in question, Severn owned 82 percent of the outstanding stock of Glen Village, Inc., with the remaining 18 percent owned by petitioner Henry J. Knott. As of September 1, 1967, Severn owned 1,908 of 2,247 shares of stock of Hillsworth Corp. (hereinafter Hillsworth), with the remaining shares held equally by John Riehl III, and Robert C. Voelkel, Jr., the Knotts' sons-in-law, and Earl T. Schultz, Sr., a longtime employee of Severn. By March 1968, Riehl's, Voelkel's, and Schultz's interests in Hillsworth were redeemed, leaving Severn the sole shareholder of Hillsworth for the remainder of the tax years in question. As with Severn, Hillsworth and Northbrook were formed under Maryland law for the purpose of developing, conducting, and operating a general construction and real estate business. When formed, both Hillsworth's and Northbrook's boards of directors were identical to Severn's, consisting of Henry J. and Marion I. Knott, and C. Edward Jones. Similarly, all three corporations had the same principal officers.

The Henry J. and Marion I. Knott Foundation, Inc., was organized under Maryland law in 1957. The officers and trustees of the foundation during the taxable years ending August 31, 1968, and August 31, 1969, included Henry J. Knott, president, Marion I. Knott, first vice president, C. Edward Jones, trustee, and 11 of the Knotts' children in various capacities. In addition, Reynold H. Byrne, the Knotts' accountant, and Leonard A. A. Siems, an unidentified individual, served as trustees.

The foundation was formed as a charitable organization to receive contributions, primarily from Henry J. and Marion I. Knott, and to make gifts to exempt organizations. Throughout its existence the foundation was an exempt organization and an organization described in section 170(c). During the years in question, the foundation was included in respondent's cumulative list of organizations described in section 170(c). Nevertheless, the foundation experienced a great deal of difficulty in obtaining a favorable ruling from the Internal Revenue Service, acknowledging its tax-exempt status. On

November 18, 1959, the foundation filed an application for recognition of exemption with the District Director of Internal Revenue Service, Baltimore, Md. After submitting various supplemental documents and information as requested by the District Director's Office, and by the Exempt Organization Branch at the Internal Revenue Service's National Office, the foundation, on October 17, 1961, received an unfavorable ruling letter denying it recognition as an organization exempt under section 501(c)(3). The basis for the Internal Revenue Service's ruling, as stated in the ruling letter, was:

The record shows that during the period of your operations you have purchased at a bargain price a parcel of land from an organization owned and controlled by Mr. and Mrs. Knott and have disposed of it at a price substantially higher than the cost to you. With the proceeds other property purchased from Mr. and Mrs. Knott was donated to an organization of their own choosing. [sic] Another corporation controlled by Mr. and Mrs. Knott was engaged to enhance the value, through the building of dwellings, of other property purchased by you at a price substantially below the actual value of the land from an organization also owned and controlled by Mr. and Mrs. Knott. You were established by the Knott family, your membership consists primarily of members of that family, the majority of the board of trustees is also composed of members of that family, and all transactions thus far have been at the suggestions, offers, and proposals of Henry J. Knott. You had no funds of any import at the time of the alleged purchase of 12.016 acres of land and could not therefore pay for any part of it. You had to rely completely upon the control and influence of Mr. Knott to assure the sale of the land as well as for the payment of the alleged purchase, no mortgage or other security being evidenced.

Furthermore, it appears that in completing the above transactions you have acted only as an agent for Mr. and Mrs. Knott in the transfer of assets in which they individually and through controlled corporations have a personal interest and your disbursement of funds have carried out their personal wishes regarding charitable distributions. You have thereby engaged in substantial noncharitable activities.

As a result of this unfavorable ruling, the foundation on October 21, 1963, paid deficiencies assessed by the Internal Revenue Service. On January 27, 1964, the foundation filed a claim for refund that was denied in full, and subsequently filed complaints in the United States District Court, requesting a refund of taxes paid. On August 2, 1965, the Internal Revenue Service, on the basis of *William Waller*, 39 T.C. 665 (1963), acq. 1963–2 C.B. 5, reversed its unfavorable ruling and held that the foundation was exempt from Federal income taxation, whereupon the foundation received a full

refund of income taxes previously paid. The real estate transactions that caused the Internal Revenue Service to initially deny the foundation exempt status were substantially identical to those involved in this case.

On December 26, 1967, Severn transferred approximately 8.1 acres of real estate to the foundation for $24,300. Severn's cost basis in the property was $24,300; the fair market value at the time of transfer was $162,857. Contemporaneous with the transfer, the foundation leased the land for a period of 51½ years at an initial annual rent of $11,400 to Paratus Corp., a straw corporation, which immediately assigned the lease to Henry J. Knott. Knott used the property and improvements to be made thereon to secure a $1,087,500 construction loan from Loyola Federal Savings & Loan Association.

On June 6, 1968, Severn made a second transfer of real estate to the foundation. This transfer involved approximately 14.7 acres of land, having a fair market value of $280,000. The foundation paid $34,522 for the property, an amount equal to Severn's cost basis in the property. As with the first transfer, the foundation contemporaneously leased the property to Paratus Corp. for 51½ years with an initial annual rent of $21,000. Paratus Corp. immediately assigned the lease to Henry J. Knott. Knott used the leased realty and improvements to be made thereon to secure a $1,160,000 construction loan from Loyola Federal Savings & Loan Association.

Both the 8.1 acres and the 14.7 acres of real estate leased by the foundation to Henry J. Knott were subsequently developed into apartment complexes, with Severn doing the construction work.

A third transfer occurred on June 9, 1969, when Hillsworth transferred 6.36 acres of real estate to the foundation for $19,080. Hillsworth acquired the property from Severn on September 1, 1965, for $19,080. The fair market value of the property at the time of transfer to the foundation was $166,500. When Hillsworth transferred the real estate to the foundation, the property was subject to a lease created September 15, 1965, to Henry J. Knott, with an initial annual rent of $13,320. Knott, as tenant, contracted with Severn to construct a 124-unit apartment complex, which it did.

A fourth transfer of real estate also occurred on June 9, 1969. On that date Northbrook transferred 6.3 acres of real estate, having a fair market value of '$184,500, to the foundation for $25,200. Northbrook acquired the property at a cost of $25,200 from Severn on April 13, 1966. Contemporaneous with its acquisition of the property, Northbrook leased the property to Henry J. Knott for 51½ years at an initial annual rent of $14,760. Upon acquisition of the lease, Knott contracted with Severn, and Severn constructed a 188-unit apartment complex.

Each of the real estate leases to Henry J. Knott provided for rental adjustments every 5 years based on movement of the consumer price index.

The above four parcels of real estate were quadrants of a larger tract of land. The larger tract was divided into quadrants so that development of a large apartment complex could proceed in stages, thereby reducing economic risk. After construction of part of the project, it was discovered that the number of dwelling units planned for at least one quadrant violated zoning ordinances that prescribed maximum density requirements. The average density of dwelling units on all four quadrants, however, complied with the zoning laws.

Because of the conflict with local zoning ordinances, C. Edward Jones, an attorney and director of Severn, Hillsworth, and Northbrook, and a vice president of all three corporations, advised Reynold Byrne, then the Knotts' accountant, that all four parcels of real estate should be transferred to one legal owner. In a memorandum to Byrne, Jones stated:

Neither Henry [Knott] nor I see any difficulty in this transaction taxwise even if Northbrook and Hillsworth sell to the Foundation at their book value, which, of course, is much, much less than the true value. Ordinarily, this would be a bargain sale, but it appears to me that we are all right in that the Foundation is tax-exempt *and Hillsworth and Northbrook will not claim a charitable deduction for the difference between the selling price and the estimated true value* (practically speaking, such a deduction would be worthless anyway unless Hillsworth and Northbrook have anything from which the deduction could be made.) [Emphasis in original.]

In keeping with Jones's memorandum, the real estate was transferred to the foundation, and no charitable contribution was reported on Severn's consolidated income tax return. No corporate minutes of any of the corporations mention the real estate transactions, the foundation's Form 990–A reports the

real estate transactions as assets purchased, and the balance sheets filed with the foundation's Form 990–A record the real estate at its cost to the foundation.

Although Byrne, the Knotts' accountant and tax adviser, died prior to trial, memoranda taken from his private files indicate he was concerned that the real estate transactions might jeopardize the foundation's exempt status. Specifically, Byrne believed the Internal Revenue Service might allege that as a result of the real estate transaction the foundation was not operated exclusively for charitable purposes.

On December 7, 1970, the foundation, pursuant to a resolution adopted by the board of trustees, transferred all of its assets, including its interest in the above four parcels of real estate, to the Associated Catholic Charities of Maryland.

Throughout their existence, Severn and its subsidiaries made large charitable contributions. Frequently, including during the years in question, the contributions were in excess of the amount allowable as a deduction under section 170(b)(2). Despite the availability of large charitable contributions, there were occasions on which no deductions were claimed.

### OPINION

During the tax years ending August 31, 1968, and August 31, 1969, Severn and its subsidiaries sold four parcels of real estate to the foundation for approximately one-eighth of their fair market value. We must decide whether these sales constitute charitable contributions in the form of bargain sales, as petitioners contend, or whether, as respondent contends, they constitute constructive dividends ultimately to the Knotts, followed by constructive charitable contributions by the Knotts to the foundation. Should we decide this question in petitioners' favor, Severn and its subsidiaries will be allowed charitable contribution deductions that reduce their accumulated taxable income, and hence, the concededly applicable accumulated earnings tax.[3] If we decide for respondent, the Knotts will be required to include the

---

[3] Sec. 531 imposes a tax on accumulated taxable income. In arriving at accumulated taxable income, sec. 535(b)(2) allows a "deduction for charitable contributions provided under section 170 * * * without regard to [the limitations imposed by] section 170(b)(2)."

additional dividend income on their recomputed 1968 and 1969 income tax returns.

Based upon the facts and record in this case, and considering relevant legal arguments, we conclude the real estate sales constituted charitable contributions to the extent the fair market value of the real estate exceeded petitioners' adjusted basis.[4]

Section 170 allows deductions for contributions or gifts to organizations, such as the foundation, which are described by section 170(c). For purposes of this section, "contribution" is synonymous with "gift." *Channing v. United States*, 4 F.Supp. 33, 34 (D.Mass. 1933), affd. per curiam 67 F.2d 986 (1st Cir. 1933), cert. denied 291 U.S. 686 (1934).

This Court defined "gift" in *Harold DeJong*, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962):[5]

A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift. * * *

Applying the test articulated in *DeJong*, we initially note that all parties agree the real estate was voluntarily transferred for less than adequate consideration. Mr. Knott, the principal officer and dominant shareholder of all corporations involved, discussed the transfers with his accountant, Reynold Byrne, and with his legal adviser, C. Edward Jones. As indicated by a contemporaneous memorandum, and by Knott's testimony at trial, all parties to the transaction were fully aware that the property rights transferred were worth considerably more than the amount paid by the foundation. We therefore conclude that the real estate was voluntarily transferred for less than adequate consideration.

---

[4] Since these transactions occurred prior to Dec. 19, 1969, when the Tax Reform Act of 1969 modified sec. 170, no basis allocation as prescribed by sec. 1.1011–2(b), Income Tax Regs., is necessary. Further, since the property was sold at its adjusted basis, Severn and its subsidiaries made charitable contributions to the extent the fair market value of the real estate exceeded its basis.

[5] On brief, respondent argues that "gift" is properly defined by *Edson v. Lucas*, 40 F.2d 398, 404 (8th Cir. 1930), and that petitioners fail to meet the criteria outlined therein. *Edson v. Lucas*, however, is not applicable, since we are concerned with characterizing an admittedly complete transfer, whereas that case focused on whether a complete transfer had occurred.

The only contested question was whether the transfers were made with an "incentive of anticipated benefit." Petitioners, of course, alleged the transfers were made with no motive other than to make a charitable contribution, a gift. The record contains substantial facts on which to base such a finding.

Henry Knott, the dominant personality behind Severn and its subsidiaries, took a strong interest in charities. He was associated in various capacities with at least 23 charities; he frequently made charitable contributions in excess of the allowable charitable deduction; and on one occasion he gave a local hospital and university a gift of several million dollars for which he claimed no charitable contribution deduction. At trial he convincingly displayed an earnest belief in the necessity to support charities. Despite his large and frequent gifts, Knott insisted that his name not be mentioned in connection with any charitable contributions. As with Knott, Severn and its subsidiaries also had commendable records of charitable giving. Their gifts were frequent and large, often in excess of the amount allowable as a deduction.

Respondent contends the sales were not intended as charitable contributions, and that they were a form of constructive dividend. In support of his contentions respondent notes that there were no corporate minutes, written resolutions, or other formal documentation indicating that charitable contributions were intended by petitioners. Additionally, respondent notes that the sales were not recorded as charitable contributions by the transferor corporations on their income tax returns, or by the transferee foundation on its information returns. For legal support of his contention that the transfers were in reality constructive dividends, respondent relies primarily upon the precedent of *Schalk Chemicals Co. v. Commissioner*, 304 F.2d 48 (9th Cir. 1962), affg. 32 T.C. 879 (1959); *Harry L. Epstein*, 53 T.C. 459 (1969); *Challenge Manufacturing Co.*, 37 T.C. 650 (1962).

Respondent's first argument essentially is that no formal corporate minutes exist which characterize the transactions as charitable contributions, and therefore, no charitable contributions were intended. This argument ignores the facts before us: the Knotts, Severn's sole shareholders, initially suggested the transfers. The transfers were subsequently

discussed in detail by all directors of all corporations. No shareholder, officer, or director voiced any objection to the transfers either before or after they occurred, yet all interested parties were fully aware of the fair market value, the substantially lesser sales price, and the charitable foundation to which the real estate was transferred. Under these circumstances, we do not think the shareholders or boards of directors intended the transactions to be anything other than charitable contributions in the form of bargain sales. The failure to pass formal corporate resolutions discussing the charitable transfers merely reflects the attitude of many closely held corporations toward maintaining corporate minutes.

As further evidence that no charitable contributions were intended, respondent points out that the real estate transactions were not recorded as charitable contributions on either Severn's consolidated income tax returns or the foundation's information returns. Once again we must disagree with the conclusions reached by respondent. The record clearly shows that the Knotts and Jones believed there were no tax benefits that Severn and its subsidiaries could derive from reporting the sales as charitable contributions. Indeed, for the years in question, the corporations made charitable contributions in excess of the allowable charitable deduction. More persuasively, the Knotts and their advisers were seriously concerned that recording the real estate transactions as charitable contributions on their income tax returns might once again jeopardize the foundation's exempt status. For almost 6 years, from late 1959 until mid-1965, the foundation was involved in time-consuming, detailed, and expensive legal actions in an attempt to obtain a favorable ruling from the Internal Revenue Service. During this time, contributions made to the foundation were not deductible, and the foundation was required to file income tax returns and pay taxes. The only basis for previously challenging the foundation's exempt status had been real estate transactions substantially identical to those in question which, the Internal Revenue Service alleged, resulted in self-dealing. Despite the respondent's acquiescence in *William Waller*, 39 T.C. 665 (1963), acq. 1963–2 C.B. 5, involving real estate transactions similar to those herein, the Knotts' accountant and tax adviser, Reynold

Byrne, expressed concern that the Internal Revenue Service might again challenge the foundation's exempt status on the basis of the transactions herein, arguing the foundation was involved in self-dealing. In light of the foundation's prior difficulties in obtaining a favorable ruling, and in light of Byrne's concern over challenges of self-dealing, we are not surprised that the transactions were reported as sales rather than charitable contributions, and that no charitable deductions were claimed. Therefore, we believe petitioners have adequately explained why no corporate resolutions or minutes were adopted, and why the transactions were not reported on the corporations' consolidated returns or the foundation's information returns as charitable contributions. Failure to report a charitable contribution, however, clearly does not bar a charitable deduction on a timely amended return. *George P. Douglas,* 1 B.T.A. 372 (1925).

In a final effort to bar any charitable deduction, respondent attempts to recharacterize the real estate transactions as constructive dividend distributions to the Knotts. In this attempt respondent relies primarily on *Schalk Chemicals Co. v. Commissioner, supra; Harry L. Epstein, supra;* and *Challenge Manufacturing Co., supra.* We find respondent's final argument based on these cases unpersuasive.

In *Schalk Chemicals,* a corporation assumed its beneficial owners' personal contract and reimbursed the beneficial owners for amounts already paid under the contract. The court found these corporate expenditures were not ordinary and necessary business expenses, and therefore disallowed the corporation's deduction under section 162. Since there were distributions to the beneficial owners and distributions in satisfaction of their personal legal obligations, the court found the beneficial owners received dividend income.

The facts of the case before us are clearly distinguishable. The corporate distributions were made under section 170, not 162, and hence deductions cannot be disallowed for failing to be ordinary and necessary. Furthermore, in the case before us there was no distribution to the shareholders, or distribution in satisfaction of their legal obligations. Lacking such distributions, *Schalk Chemicals* may not be relied upon to impute dividend income to the Knotts.

*Harry L. Epstein, supra,* is similarly inapplicable to the facts before us. In *Epstein* there were corporate transfers for less than adequate consideration to a trust established for the benefit of the shareholders' children. We noted in *Epstein* at page 474 that, "It has been long recognized that where a corporation has made such a transfer to a member of the stockholder's family * * *, the stockholder has enjoyed the use of such property no less than if it had been distributed to him directly." In the case before us, we have no transfer to a member of the stockholders' family. Moreover, respondent has stipulated that the foundation—the recipient of the corporate distributions—was at all times an exempt organization under section 501(c)(3), and a charitable organization under section 170(c). As such, respondent has stipulated that the foundation was organized and operated *exclusively* for charitable purposes, and *no part* of its net earnings inured to the benefit of any private shareholder or individual. Sec. 170(c); sec. 501(c)(3). Implicit therefore is respondent's acknowledgment that all dealings between the foundation and the Knott family were at arm's length. Lacking any benefit to the Knott family unit, *Epstein* may not be relied on to impute dividend income to the Knotts.

*Challenge Manufacturing Co., supra,* also fails to support respondent's argument. In *Challenge Manufacturing,* the corporate taxpayer claimed deductions under section 162 for costs incurred in maintaining the sole shareholder's boat, for paying the sole shareholder's and his wife's traveling expenses, and for paying certain of the sole shareholder's personal expenses. Unlike the taxpayer in *Challenge Manufacturing,* the corporate petitioners do not claim section 162 deductions for the distributions to the foundation, and therefore they need not prove their distributions were ordinary and necessary. Furthermore, the corporate distributions herein were not used to purchase and maintain a boat for the Knotts, pay Mrs. Knott's traveling expenses, or otherwise pay the Knotts' personal expenses. Without similar personal financial benefits, respondent's attempted application of *Challenge Manufacturing* to the facts before us is simply unpersuasive.

Although respondent contends the Knotts received constructive dividends from Severn and its affiliated corporations, he has not been able to point to any benefits normally

associated with such a characterization. The Knotts did not receive money or other property from the corporations; their personal debts were not assumed by the corporations; the corporations did not purchase and maintain property for the Knotts' personal use and enjoyment; and the Knott family members did not obtain property or other benefits. Indeed, the only significant benefit we can find was obtained by the foundation: for $103,102, the foundation purchased property with a fair market value of $793,857, producing initial annual rental income of $60,480.[6]

Having found that the facts and record support petitioners' position, and having further found respondent's arguments unconvincing, we therefore conclude that Severn and its subsidiaries made charitable contributions to the extent the fair market value of the real estate transferred to the foundation exceeded the amount realized. Severn and its subsidiaries may therefore deduct these charitable contributions in calculating their accumulated taxable income. Sec. 535(b)(2). We further conclude that the Knotts did not receive dividend income as a result of the real estate transfers to the foundation.

Other issues having been settled,

*Decisions will be entered under Rule 155.*

---

[6] In further contrast to constructive dividend cases, the net effect of these real estate transactions is that Henry Knott was required to *pay* rent on two parcels of real estate he previously owned through controlled corporations. This is in direct conflict with the concept of a dividend where shareholders usually *receive* property distributions. Additionally, the rent Knott paid on all four parcels no longer remained within the group of controlled corporations, but was paid to the foundation which, in turn, annually distributed it to various charitable organizations.