STANLEY WARANCH AND CAROL B. WARANCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Waranch v. Commissioner
Docket No. 21927-87
United States Tax Court
T.C. Memo 1989-596; 1989 Tax Ct. Memo LEXIS 599; 58 T.C.M. (CCH) 584; T.C.M. (RIA) 89596; October 31, 1989
R. Braxton Hill III and Hunter W. Sims, Jr., for the petitioners. William L. Ringuette, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1982, 1983, and 1984 in the amounts of $ 9,373, $ 93,180, and $ 75,350, respectively. The issues for decision are 1) whether petitioners are entitled to a charitable contribution deduction resulting from a bargain sale of stock to the City of Virginia Beach, Virginia (city of Virginia Beach); 2) if so, the proper amount of such deduction; and 3) whether petitioners are liable for an addition to tax of $ 22,605 for a valuation overstatement under section 6659[1] for the taxable year 1984. FINDINGS OF FACT Some of the facts are stipulated and the stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided *601 in Norfolk, Virginia at the time the petition was filed. Petitioners timely filed their joint income tax returns for the taxable years 1982, 1983, and 1984 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner Stanley Waranch (Waranch) is a party in this case solely because he filed a joint tax return with his wife for the years in issue. Carol B. Waranch (petitioner) owned 25 shares of stock (out of 100 shares outstanding) of Kempsville Utilities Corp. (Kempsville) and 50 shares of stock (out of 100 shares outstanding) of County Utilities Corp. (County). Each corporation consisted of a sewage treatment system including treatment plants, pumping stations, sewer lines, and related real estate. Being public utilities, their rates were regulated by the state corporation commission. In the 1950's and 1960's, County and Kempsville built the subject sewage collection and treatment facilities with the full encouragement and endorsement of the local and state authorities in order to provide adequate service to the emerging development projects in Princess Anne County. Waranch was a major real estate developer. County's treatment facility was constructed in two *602 phases. The original plant was built in 1956, and the second phase was constructed in 1960. At that time, it was located in an area in Princess Anne County which merged with and became Virginia Beach in 1963. The facility was situated on, and its effluent discharged into, Buchanan's Creek, a small estuary at the headwaters of the Lynnhaven River. The facility included two secondary treatment plants, two large holding ponds, and sludge drying beds. Such plants, which involve a secondary treatment or excess aeration process, are still built today. County served what may be termed a subdivision containing moderately priced single-family dwellings, several multifamily housing developments, and commercial developments consisting of small businesses and offices. No major industrial concerns were served by the utility. The area served by County was irregularly shaped and consisted of approximately 800 acres with some desirable land available for future development. Sanitary sewage collection and treatment were provided to an estimated 1,947 equivalent residential connections, and estimated future revenue is based upon service to 2,361 equivalent connections in the boundaries of *603 the area served. The subdivision served lies within the boundaries of the city and was completely surrounded by the city's sewer collection system. Kempsville's treatment facility was constructed in two phases. The original plant was built in 1959 and the second phase was constructed in 1964. Kempsville consists of a sanitary sewage collection system, three sewage pumping stations, and a sewage plant providing secondary treatment and sludge disposal. The area served by Kempsville was roughly rectangular in shape, comprised of approximately 800 acres with little desirable land available for future development. Sanitary sewage collection and treatment was provided to an estimated 2,221 equivalent residential connections, and estimated future revenue is based upon service to 2,357 equivalent residential connections. The subdivision lies within the boundaries of the city and is completely surrounded by the city's sewer collection system. In early 1976, Waranch, president of County and vice president of Kempsville, was visited by Aubrey Watts, director of public utilities for the city, regarding the city's interest in acquiring the facilities. The city desired to purchase the *604 property of the utilities in order to incorporate it into its service area and system. The city engineering staff, along with Wiley and Wilson, Inc. (Wiley and Wilson), consultants to the city, met with management of the corporations and visited the facilities' sites during March and April 1976. Wiley and Wilson issued a report containing an inventory of property and proposed valuation, which was submitted to the city during May 1976. In November 1976, the management of the corporations met with George L. Hanbury II, the city manager. The management concluded that the proposed valuation contained in the Wiley and Wilson report was grossly inadequate and, unless the city were willing to deal on more realistic terms, there would be no further negotiations. During 1977, the city was actively engaged in pursuing acquisition of other sewer facilities, namely Princess Anne Utilities Corp., Aragona Utilities Corp., and Primbrook Utilities, Inc. Pursuant to a contract dated October 26, 1977, the city acquired these sewer facilities. In the latter part of 1977, the city again approached management of the corporations in issue to discuss an acquisition based on more realistic values. *605 Management of the corporations and the city engaged in a series of meetings from February through July 1978, which culminated in a tentative agreement between the stockholders and the city manager's office. Draft contracts were prepared that disclosed a claimed fair market value of the corporations at approximately $ 8 million with the sales price to the city of approximately $ 4 million and a resulting claim of charitable contributions of approximately $ 4 million. These contracts were submitted to the city council in July 1978 for approval. Meanwhile from November 1977, up to and continuing past the date of the referenced city council's meeting, the State Water Control Board adopted special standards "J" and "K" dealing with the amount of nitrogen and phosphorous permitted to be discharged in receiving waters. The stockholders of County and Kempsville challenged these standards as being unreasonable. The corporations filed suit to prevent enforcement of the standards, and the matter was pending at the time of the referenced city council's meeting. Following that, the city council voted not to pursue the proposed acquisition at that time. The corporations ultimately prevailed *606 in their suit against the State Water Control Board in 1979. The matter was affirmed in favor of the corporations in 1982 by the Virginia Supreme Court. No further significant discussions occurred until 1981 when the city initiated renewed negotiations to purchase Kempsville and County. Contract discussions continued throughout 1981 and into 1982 and culminated in the signing by all of the shareholders of the corporations of contracts in July 1982 (dated June 30, 1982) providing for the sale of County and Kempsville to the city on August 31, 1982. On August 31, 1982, the city purchased all of the stock of both corporations for $ 4,020,149. The claimed aggregate fair market value of the stock of both corporations was collectively reported at $ 7,996,214 by petitioners and the other stockholders in their respectively filed income tax returns. In the 1982 agreements relating to County and Kempsville, paragraph 8, "Contribution to Buyer" stated: Buyer and Sellers hereby agree that in the case of any Seller who receives, pursuant to paragraph 18 hereof, an amount of cash and notes (at face value) which is less than the fair value of shares of the Stock sold by such Seller, such *607 Seller shall have made a bargain sale (that is, a sale for less than fair market value) and the amount by which the fair value of the shares of the Stock so sold by such Seller exceeds the amount so received therefore by such Seller constitutes a contribution in kind of such excess value by such Seller to Buyer. The stockholders reported a claimed bargain sale to the city resulting in an aggregate charitable contribution to the city in the amount of $ 3,976,065, petitioners' proportionate share of which constituted the charitable deduction at issue here. The valuation of the facilities as agreed to by the city and the shareholders was the fair market value of the facilities "as is" prior to the transfer to the city and prior to any special use the city may have had for the facilities. To aid in their efforts, the stockholders retained the engineering firm of Basgier and Associates (Basgier) to prepare appraisal reports of the corporations and the land upon which they were situated. Basgier is a professional corporation which employs approximately 145 people in the respective fields of engineering, landscape architecture, and surveying. Basgier is president and chief engineer. *608 He has done several appraisals of public drainage and utility projects. He has over 20 years' experience with sewer utility systems in the city. The reports were prepared for valuation of the corporations as of February 15, 1982, and incorporated the inventory of property from the Wiley and Wilson report. Basgier made no detailed verifications of the inventory. Basgier did make a "cursory examination" which showed that the quantities shown on the 1976 Wiley and Wilson report were reasonably accurate. These appraisal reports claimed valuations based on reproduction cost new less depreciation as of February 15, 1982. Petitioners also retained the services of a William J. Jonak (Jonak), a certified real estate appraiser from the area, to determine the value of the land upon which County and Kempsville were situated. The city retained the engineering firm of Alvord, Burdick & Howson (ABH), with headquarters in Chicago, Illinois, to prepare appraisal reports for them. The city's engineering staff, along with an ABH senior partner engineer representative, Mr. William H. Richardson (Richardson), met with the management of the corporations and visited the facility sites during the *609 summer of 1981. Richardson is a sanitary and environmental engineer. The reports were prepared for valuation of the corporations as of August 31, 1981, and were delivered to the city on December 1, 1981. Waranch did not review these reports until 1986, nor did Richardson reveal to petitioners any figures or information concerning their content. The Internal Revenue Service (IRS) engineering report and the IRS supplemental engineering report were prepared in 1985 by Joseph A. Roussos (Roussos) without any physical inspection of the treatment plans or collection systems in 1985. He prepared his original engineering report based on various information on the corporations and assets involved, including the Basgier appraisals, state agencies, and newspaper articles. He later prepared the supplemental engineering report when he received additional material, the ABH appraisal reports, and used the ABH reports to determine fair market value. Roussos generally agreed with the findings in the ABH reports but determined that the fair market value should be based on the recommended offer price in the ABH reports, an amount 25 percent greater than the original cost less depreciation valuation, *610 totaling $ 629,000 for County and $ 808,500 for Kempsville. Roussos, although a licensed engineer, had no appraisal experience prior to preparing these reports for the IRS. He did not sign his name to the appraisals until completing his educational classes in appraising. Roussos did not present an appraisal for the underlying real estate. Below is a summary of the different appraisals and values determined for County and Kempsville by the various appraisers. The "Basgier" appraisal for petitioners determined the following values for County and Kempsville: SEWER SYSTEM REPLACEMENT ANALYSIS [2]
Replacement
Adustment for
Depreciated
Cost
Depreciation
Value
County
Treatment Plant
$ 1,000,000
$   250,000
$   750,000
Holding Lagoons (2)
250,000
250,000
Pump Stations
475,000
118,750
356,250
Lines and Facilities
2,631,559
657,890
1,973,669
Treatment Plant and
Pumping Station Sites
385,000
385,000
Total
$ 4,741,559
$ 1,026,640
$ 3,714,919
Kempsville
Treatment Plant
$ 1,000,000
$   230,000
$   770,000
Pump Stations
415,800
95,634
320,166
Lines and Facilities
3,235,233
744,104
2,491,129
Treatment Plant and
Pumping Station Sites
700,000
700,000
Total
$ 5,351,033
$ 1,069,738
$ 4,281,295
*611 The "ABH" appraisals for the City of Virginia Beach determine the following values for County and Kempsville as follows: County
a. Estimated Reproduction Cost New Less
Depreciation (Exclusive of Land Costs)
$ 3,109,990
b. Estimated Original Cost Less Accrued
Depreciation (Exclusive of Land Costs)
696,700
c. Estimated Upper Limit of Value Based on
Reproduction Cost New Less Depreciation
of properties used and useful to the City
(Exclusive of Land Costs)
2,207,050
d. Estimated Value of the Original Cost Less
Depreciation of the properties used
and useful to the City (Exclusive of
Land Costs)
503,240
e. Estimated Economic Value based upon
1) Cash Method (Exclusive of Land Cost)
683,900
2) Utility Method (Exclusive of Land Cost)
610,400
Based upon the above analyses, ABH recommended that the city tender an offer to County in the amount of $ 629,000, which is 25 percent greater than the original cost less depreciation, for the purchase of the property used and useful to the city (exclusive *612 of land cost), and noted that in the transfer of property, the sale price is usually greater than the original cost less depreciation and less than the reproduction cost new less depreciation of the assets purchased. Kempsville
a. Estimated Reproduction Cost New Less
Depreciation (Exclusive of Land Costs)
$ 3,239,370
b. Estimated Original Cost Less Accrued
Depreciation (Exclusive of Land Costs)
822,000
c. Estimated Upper Limit of Value Based on
Reproduction Cost New Less Depreciation
of properties used and useful to the City
(Exclusive of Land Costs)
2,521,000
d. Estimated Value of the Original Cost Less
Depreciation of the properties used
and useful to the City (Exclusive of
Land Costs)
646,800
e. Estimated Economic Value based upon
1) Cash Method (Exclusive of Land Cost)
711,400
2) Utility Method (Exclusive of Land Cost)
634,900
Based upon the above analyses, ABH recommended that the city tender an offer to Kempsville in the amount of $ 808,500, which is 25 percent greater than the original cost less depreciation, for the purchase of the property used and useful to *613 the city (exclusive of land cost). Subsequent to June 30, 1982, and prior to or simultaneous with the August 31, 1982, closing of the stock sale, Kempsville disposed of a parcel of real estate referred to as parcel A and acquired a parcel of real estate referred to as parcel C. Petitioners retained the real estate appraisal firm of Jonak to prepare an appraisal report for all real estate, exclusive of improvements, owned by the corporations, taking into account Kempsville's disposition of parcel A and acquisition of parcel C. The report determined the valuation of the real estate on August 31, 1982. The appraisal report given by Jonak reflected a valuation of the property in question as follows: County:
Pump Station Sites:
Site D-1  Malibu Sec. 5
$  33,231
Site D-9  Parcel P Part, Malibu Sec. 5
54,844
Site D-12 Pump Station at the Palms at
Malibu
6,000
Site D-16 Parcel B, Block B, Birchwood
Gardens, Sec. 5
24,184
Plant Sites:
Site D-5  Malibu Pond Site
10,717
Site D-13 Birchwood Gardens Plan and
Pond Site
359,295
Total
$ 488,271
Kempsville:
Pump Station Sites:
Site D-3  Arrowhead Pump Station Site
$  46,306
Site D-4  Carolanne No. 1 Pump Station Site
32,295
Site D-11 Carolanne No. 2 Pump Station Site
17,553
Plant Sites:
Site D-7  Parcel B
507,465
Site D-7  Parcel C
244,920
Total
$ 848,539
*614 Respondent contends that the fair market values are $ 629,000 for County and $ 808,500 for Kempsville based on ABH's conclusion that the city's first offer should be 25 percent greater than the original cost less depreciation of the properties used and useful to the city. Petitioners contend that the proper method of valuation is reproduction costs new less depreciation based on the Basgier appraisal. OPINION Section 1.170A-1(c)(1), Income Tax Regs., provides that "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution." Section 1.170A-1(c)(2), Income Tax Regs., provides that the fair market value "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." The fair market value of a piece of property at a given date is a question of fact to be resolved from a consideration *615 of all the relevant evidence in the record. See Kaplan v. Commissioner, 43 T.C. 663, 666 (1965). We note at the start that valuation of property is often capable of resolution by the courts only through a "Solomon-like pronouncement." Symington v. Commissioner, 87 T.C. 892, 904 (1986); Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). "The Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road-compromise * * *." Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. at 452. Moreover, in deciding if one or the other party is more convincing, we need not accept either party's expert testimony concerning value entirely, in part, or at all. See Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974). Petitioner bears the burden of proving that respondent's *616 determination of the fair market value of the stocks in question (what the city paid for County and Kempsville) is in error. Rule 142(a). Fair market value of County and Kempsville Utilities
With full regard for all of the relevant evidence that is before us, we view the ABH appraisals to be the most conclusive evidence of the value of the County and Kempsville utilities in the record. Richardson, an experienced engineer, performed the appraisal independent of any considerations other than providing a range of values from which the city, his client, might begin negotiations. Moreover, we found him to be a knowledgeable and reliable witness. We do not find that Basgier's or Roussos' appraisals were as well founded or researched. Basgier based his appraisal primarily on a 1976 inventory report (6-years old on the appraisal date) and a "cursory" examination of the premises. His engineering appraisals provided conclusions but very little basis for the conclusions. We also doubt whether Basgier took adequate time to prepare the appraisals. Basgier provides absolutely no indication of how he arrives at the figures in the appraisals for the land sites. Roussos' reports are *617 even less convincing and more in the nature of critiques of the other appraisals. Clearly, Roussos was much more limited in 1985 because he could not perform a physical inspection. Furthermore, while he did have an engineering degree, these were his first appraisals, and he had limited experience in this area. In any case, Roussos agrees with the ABH valuation and adopts its valuation as his own. Roussos, however, believes that the proper fair market value is 25 percent greater than the original cost less depreciation (OCLD) of properties used and useful to the city, the amount suggested by ABH as an opening offer. Respondent submits that the ABH reports used "reasonable judgment of all relevant facts when they arrived at what they believed was the fair market maximum values to be placed on the two systems." However, respondent contends that the proper fair market value from the ABH report is the OCLD for properties used and useful to the city plus 25 percent, rather than one of the other approaches in the ABH report, all of which produce higher values. Respondent urges that his lower value takes into consideration the risks involved in purchasing the properties, which required *618 a number of improvements that had to be made to bring the properties up to the standard of other facilities, as well as the investment which had to be made in connecting the system to the Hampton Roads sanitary district and to integrate the sanitary sewage systems into the city system. Petitioner contends that the proper method of valuation is reproduction cost new less depreciation (RCNLD), and points out that while reproduction costs may be in excess of fair market value, that is why depreciation is taken into account. The depreciation takes into consideration actual physical loss in value of the properties as well as any degree of technical obsolescence. Fully supporting this method of valuation would be the cost to the city either to acquire the facilities by condemnation or to construct new parallel facilities, which in either event would have been either equal to or greater than the RCNLD valuation. Petitioner continues that, in addition, the determination of the fair market value of two self-sufficient utility corporations must take into consideration each and every asset owned. The fair market value on the whole does not consist of only the value of those few parts which *619 the city decides to use. Nor is the value reduced by the cost to the city of its choice to connect some of the assets to a different system and to demolish the remaining assets, especially when both sufficient facilities were continued in use, fully operated, for over a year after acquisition. Finally, petitioner contends that respondent's use of the term maximum fair market value to describe ABH's original suggested offer is misplaced. After a review of the record, we find that the RCNLD is the proper method of appraisal in this case. The American Institute of Real Estate Appraisers describes the situation where RCNLD may be a useful indication of value. The cost approach is also used to estimate the market value of * * * special-purpose properties, and other properties that are not frequently exchanged in the market. Buyers of these properties often measure the price they will pay * * * against the cost to build a replacement, minus accrued depreciation, or the cost to purchase an existing structure and make any necessary modifications. If comparable sales are not available, they cannot be analyzed to estimate the market value of such properties. Therefore, the currently *620 accepted market indications of depreciated costs, or the costs to acquire and refurbish an existing building, are the best reflections of market thinking and, thus, of market value. In any market, building value can be related to the cost to reproduce or replace the building. The cost approach is particularly important when a lack of market activity limits the use of the sales comparison approach and when the properties to be appraised -- e.g., single-family residences -- are not amenable to valuation by the income capitalization approach. To estimate market value in these situations, an appraiser can calculate the cost of a replacement or reproduction of the building and then make a deduction for the amount of depreciation present in the existing improvement. * * * To estimate market value in these situations, an appraiser can calculate the cost of a replacement or reproduction of a building and then make a deduction for the amount of depreciation present in the existing improvement. * * * Reproduction cost is the estimated cost to construct, at current prices, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, *621 design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies, and obsolescence of the subject building. [American Institute of Real Estate Appraisers, Appraisal of Real Estate, 349-351 (9th ed. 1987)] We have held that the RCNLD method is important evidence of value and has therein important elements to prove either market value or actual value. However, we have recognized that depreciation is to be concretely determined by inspection and that factors such as actual use, condition, and age are all relevant in arriving at an appropriate rate of depreciation. Kinsman Transit Co. v. Commissioner, 1 B.T.A. 552 (1925); Rockford Malleable Iron v. Commissioner, 2 B.T.A. 817 (1925). ABH's Richardson did a detailed appraisal using RCNLD of the sanitary sewage collection system, the three sewage pumping stations, and force mains at a sewage plant providing secondary treatment and sludge disposals. His conclusions are listed below: RCN and RCNLD
County
Item
RCN
Depreciation
RCNLD
Collection System
$ 2,205,500
$   496,800  $ 1,708,700
Pumping Stations
351,970
141,500  210,470
Treatment Plant
1,312,000
526,800  785,200
Subtotals
$ 3,869,470
$ 1,165,100  $ 2,704,370
General Overheads 15%
580,420
174,800  405,620
Totals
$ 4,449,890
$ 1,339,900  $ 3,109,990
Kempsville
Collection System
$ 2,454,600
$   467,500  $ 1,987,100
Pumping Stations
339,270
134,200  205,070
Treatment Plant
1,051,400
426,700  624,700
Subtotals
$ 3,845,270
$ 1,028,400  $ 2,816,870
General Overheads 15%
576,800
154,300  422,500
Totals
$ 4,422,070
$ 1,182,700  $ 3,239,370
*622 Richardson's study was based upon available records, maps, drawings, and specifications furnished to him and further substantiated by information obtained during a careful, physical inspection of the properties. The various items of properties were also studied with respect to the physical condition and consideration of the ability to be simulated into and to economically service part of the Virginia Beach sewage system. Based on all the information available to him, he determined the RCNLD to be $ 3,109,990 for County and $ 3,239,370 for Kempsville, exclusive of real estate. While the ABH report recommended initial offers, which were 25 percent greater than the OCLD of properties used and useful to the city, this was meant to serve as a starting point for the city to purchase the assets and not as the fair market value. While the above-described OCLD method is one method available, we do not think it is the proper measure of value in the instant case. In determining this value, Richardson used the actual original costs where the records were available, and where they were not, he "determined the value as of August 31, 1981, and then used the industry's trending factors * * *623 * applied it to the appropriate classes of facilities and index[ed] it back to the year of installation." Richardson then deducted accrued depreciation which has occurred since the original installation. We find that the cost to build the installation in the late 1950's is only tenuously related to its true fair market value. Respondent has not presented compelling evidence as to why we should conclude otherwise. Richardson, in fact, testified that he would have been surprised had the two properties transferred at 25 percent greater than OCLD for properties used and useful to the city. Richardson also pointed out that his recommended first offer price was based on revenue: And what would that revenue support as to the purchase of that system? And we were pointing out to them the risks that they would have to take on in that system. If they immediately imposed a rate increase, then that value would have gone up. If the interest rates at that time, which I think we were figuring somewhere 10-12 percent, and that was a time when interest rates were very high, if those interest rates went down, then the economic value would have increased. If we did the economic value today, *624 the economic value would be greater than what we predicted in 1981. * * * It was a recommendation based upon the business of providing sewage service to an area. And that's what we based our recommendation on, very heavily on the economic value of those facilities. While the RCNLD may appear high when viewed in light of the ultimate use of these facilities by the city, the facilities were purchased "as is," and petitioners should not be burdened with concerns which affect the city, merely with receiving the value of what they sold. For this reason, we decline to adopt as fair market values the "Estimated Upper Limit of Value Based on RCNLD of Properties Used and Useful to the City" as listed previously. Whether the city chose to operate these plants, part of these plants, or completely demolish them was a decision to be made after the sale was consummated. Specifically, we do not believe that costs for the connection to the Hampton Roads sanitation district, for demolition of the treatment plant, or for operation and maintenance once purchased are properly deductible from the fair market values. Moreover, we also conclude that no further deductions should be taken for anticipated *625 improvements to comply with state and local regulations. This is generally taken into account in the RCNLD's consideration of the depreciation and obsolescence of the property (i.e., the difference between a new facility in compliance with all regulations and the existing facility as sold). Moreover, the corporations were never cited for any violation or required by the governing authoritative to spend money on capital improvements or compliance expenditures. Thus, we conclude that the value, exclusive of land, of County was $ 3,109,990 and Kempsville $ 3,239,370, based on the ABH appraisals. Fair Market Value of Land
Petitioners retained the real estate appraisal firm of Jonak to prepare an appraisal report for the real estate exclusive of improvements owned by the corporations, taking into account Kempsville's disposition of parcel A and acquisition of parcel C. The report was prepared for evaluation of the real estate as of August 31, 1982. The exchange of parcel A for parcel C prior to the city's acquisition of Kempsville was requested by the city and carried out by the management of Kempsville. The Jonak report indicated that the fair market value of the real estate *626 owned by the corporations at the time of the transfer, after giving effect to the parcel A exchange for parcel C, was $ 848,539 for Kempsville and $ 488,271 for County, taking into account all of the relevant factors normally considered in the real estate industry, such as current use, potential use, replacement cost, and comparable sales. In the Jonak report, the following considerations were specifically taken into account. The parcels were appraised at their highest and best use, a condition that is dictated by several factors including individual zoning designation, surrounding uses, and the physical attributes of the individual sites. The properties were situated in a suburban, single-family residential environment. With only one exception, the individual parcels are zoned residential in an R-6 (7,500 square foot minimum lot size) or an R-4 (15,000 square foot minimum lot size) category. One parcel bears a B-2 (community business) zoning designation. Physically, the parcels fall into two categories -- small, lot-like parcels, fronting the residential streets or small acreage tracts, ranging from 3 to 12 acres, at the margins of established, fully-developed residential subdivisions. *627 The smaller parcels, pump station sites, range in size from approximately 10,000 square feet to over 22,000 square feet and have all the amenities and characteristics of a residential lot. Small acreage tracts also have the amenities, utilities, and locational advantages of the abiding residential lots. Respondent objects to highest and best use appraisal of these properties. Respondent suggests that the real estate tax assessor's values provides the best evidence of fair market value of the properties in question. Respondent did not do an independent appraisal of the land. However, respondent concludes that because the real estate tax assessor's values are ostensibly 100 percent of market value, that this is far more indicative of the fair market value of these specific parcels than the Jonak report. Respondent concludes the fair market values are as follows: County
(1) Pump Station Sites:
Site D-1  Malibu Sec. 5
$  10,000
Site D-9  Parcel P Part, Malibu Sec. 5
17,000
Site D-12 Pump Station at the Palms at
Malibu
10,000
Site D-16 Parcel B, Block B, Birchwood
Gardens, Sec. 5
10,000
(2) Plant Sites:
Site D-5  Malibu Pond Site
45,000
Site D-13 Birchwood Gardens Plan and
Pond Site (10.778A)
164,000
Total
$ 256,000
Kempsville
(1) Pump Station Sites:
Site D-3  Arrowhead Pump Station Site
$ 10,000
Site D-4  Carolanne No. 1 Pump Station Site
10,000
Site D-11 Carolanne No. 2 Pump Station Site
10,000
(2) Plant Sites:
Site D-7  Parcel "B"
Site D-7  Parcel "C"
69,193
Total
$ 99,193
*628 We find the highest and best use was the proper method of appraisal. The American Institute of Real Estate Appraisers states that when doing a land or site valuation -- Land value must always be considered in terms of highest and best use. Even if the site has improvements, the value of the site is based on its highest and best use as though vacant and available for development to its most economic use. Consideration of the land as though vacant is a commonly accepted procedure which facilitates the orderly analysis and solution of appraisal problems that require land to be valued as a separate component. [Appraisal of Real Estate, supra at 300.] Under certain circumstances, the appraisal of a property may require that the site be considered in terms other than its highest and best use. In an appraisal to estimate the use value or legal nonconforming use value of an approved site, an appraiser may often need to value the site according to its specified use or the existing improvement, not its highest and best use. In this case, the appraiser should value the site both in terms of its highest and best use and its conditional use. The American Institute of Real Estate *629 Appraisers comments that -- Taxation levels are significant in considering a property's potential uses. From the present assessment, the tax rate, and a short history of tax rate, the appraiser can form a conclusion about future trends in property taxation. Assessed values are not good indicators of market value because mass appraisals tend to equalize the application of taxes rather than produce realistic appraisals of market value. [Appraisal of Real Estate, supra at 198.] We find that Jonak's appraisals are the best indication of the market value of the properties, absent contrary evidence. Respondent did not submit an independent appraisal and we do not find on this record that the tax assessment rate represents the valuation where a thorough land valuation was prepared. The land values are accordingly $ 488,271 for County and $ 848,539 for Kempsville. We now must determine whether a bargain sale occurred. Bargain sale
A taxpayer who makes a bargain sale to charity is typically entitled to a charitable contribution deduction equal to the difference between the fair *630 market value of the property and the amount realized from the sale. Sec. 170(a)(1). See Stark v. Commissioner, 86 T.C. 243, 255-256 (1986); Knott v. Commissioner, 67 T.C. 681 (1977); Waller v. Commissioner, 39 T.C. 665, 677 (1963). Like any purported charitable contribution, however, a sale for less than full consideration results in a deduction under section 170 only if the statutory requirements are satisfied. In the present case, petitioner is entitled to a deduction only if she made the bargain sale "to or for the use of -- (1) A State, a possession of the United States, or any political subdivision of any of the foregoing * * *" and "for exclusively public purposes." See section 170(c)(1). Virginia Beach is such an exempt organization under section 170(c)(1). Whether these requirements are satisfied, therefore, depends primarily upon the intent of the donor under standards similar to that articulated in Commissioner v. Duberstein, 363 U.S. 278 (1960). Only where the taxpayer's actual motivation is to benefit the charitable organization and not himself or some other nonqualifying person is he entitled *631 to a deduction. See Stark v. Commissioner, 86 T.C. at 256; Knott v. Commissioner, 67 T.C. at 689; Tate v. Commissioner, 59 T.C. 543, 549, 550 (1973); Sutton v. Commissioner, 57 T.C. 239, 242-243 (1971); Kluss v. Commissioner, 46 T.C. 572, 575 (1966); and the cases cited therein. As used in section 170, the phrase "charitable contribution" is synonymous with the word "gift." See DeJong v. Commissioner, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). A gift is the result of a "detached and disinterested generosity." Commissioner v. Duberstein, 363 U.S. at 285. If a transfer is motivated by some anticipated benefit to the donor beyond the mere satisfaction flowing from the performance of the generous act, the transfer does not constitute a gift. Furthermore, no charitable deduction is allowed where a taxpayer transfers part of his property with the intention of obtaining a direct or indirect benefit in the form of enhancement to the value *632 or the use of his remaining property. See Sutton v. Commissioner, 57 T.C. at 242. Finally, the taxpayer who negotiates for the best terms he can obtain in a commercial transaction cannot subsequently claim a deduction based upon any excess value of the "contributed property" over the consideration received therefore. See Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 604 (1980); Grinslade v. Commissioner, 59 T.C. 566, 577 (1973). Respondent submits that there were no bargain sales here because the conveyances in question were not made for charitable purposes but rather made with the expectation of receiving financial benefits that were commensurate with, if not greater than, the value of the property conveyed. Respondent contends that petitioners have not shown a charitable purpose which petitioner sought to serve by the sale of her stocks. Respondent continues that petitioner's true intentions when she sold the shares of stock in question are not known because she did not take the stand to testify with respect to what her intent was respecting such sales to the city. Finally, respondent points to the *633 negotiations of petitioner's representatives with the city and concludes that due to these negotiations petitioner was seeking the best terms she could obtain in the commercial transaction that she entered into, and cannot now claim any deduction based upon the excess value of the contributed property over the consideration she received. Petitioner contends that the fair market value of County and Kempsville is almost twice as much as the actual consideration paid. Throughout all the discussions with the city, the basic format of the negotiations involved the bargain sale whereby the parties would attempt to ascertain a fair market value of the property with the city purchasing the corporations at a discount and petitioners making a charitable contribution of the excess value. From the start it was known that the city could not afford the full price. Accordingly, it is clear from the actions of all the parties involved that a donative intent in the form of a bargain sale was manifested throughout the entire course of the subject transactions. Furthermore, petitioners point out that there was absolutely no benefit, economic or otherwise, accruing to petitioners in this case. *634 On this record, we are persuaded by petitioners' arguments that they did, in fact, have the requisite donative intent when they sold County and Kempsville to the city. The fact that petitioner did not testify to this is not of the utmost importance because the record is otherwise sufficient to support this conclusion. Waranch, the representative of all the stockholders of both County and Kempsville, who negotiated the transaction from its inception when it was first proposed in 1976 through its consummation in 1982, testified concerning the negotiations of the transaction and all its elements. We found his testimony credible and believe he was sincere when he testified that "It was always the understanding that [the city] could not pay the fair market value and that the difference between what they did pay and the fair market value would be a charitable contribution." Thus, while there were negotiations concerning what the city would pay, there was never any misunderstanding that what the city could not afford to pay would be a bargain sale. We believe that petitioners' willingness to convey the land for less than its full value, as previously determined, was based upon genuine, *635 donative intent. Moreover, there was no such substantial direct personal benefit to the taxpayers or to someone else in this case. See Sutton v. Commissioner, 57 T.C. 239 (1971). In fact, the only beneficiary was the city, which was able to purchase the systems for half their fair market value. While the city may have ultimately abandoned the County and Kempsville treatment plans in order to incorporate the pipelines into its service area, we cannot look at this factor when determining the requisite intent at the time of the sale, one year earlier. Thus, respondent's argument that petitioner received more than the value of the property she conveyed to the city and, therefore, received financial benefits from the bargain sale, is not valid based on our conclusions determining the value of the properties in question. We find that the fair market value is the price as reflected in the RCNLD valuation of the ABH reports, plus the land values from the Jonak report, totalling $ 3,598,261 for County and $ 4,088,009 for Kempsville. Any difference between those amounts and the amount realized from the sale is a charitable contribution and results in a deduction under *636 section 170. Based on our conclusions that the fair market value of the stock claimed by petitioners is not 150 percent or more than the fair market value determined in this opinion, petitioners are not liable for an addition to tax under section 6659(f). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Basgier uses replacement cost analysis interchangeably with reproduction cost.↩